Beryl A. Howell, Chief Judge
In December 2017, the United States Attorney for the District of Columbia served two Chinese banks-Bank One and Bank Two-with a grand jury subpoena, and a third Chinese bank-Bank Three-with an administrative subpoena.[1] All three *45 subpoenas are for records of transactions for [REDACTED], a now-defunct Hong Kong based front company for North Korea's state-run [REDACTED]. Each bank refused to comply. Almost a year later, on November 29, 2018, the government moved to compel each bank's compliance with their respective subpoena. See Gov't's Mot. Compel. Produc. Docs. Req. Via Bank of Nova Scotia Subpoenas-Bank One ("Gov't's Mot.-Bank One"), ECF No. 1 (No. 18-175); See Gov't's Mot. Compel. Produc. Docs. Req. Via Bank of Nova Scotia Subpoenas-Bank Two ("Gov't's Mot.-Bank Two"), ECF No. 1 (No. 18-176); Mot. Compel. Produc. Doc. Req. Via Administrative Subpoena ("Gov't's Mot.-Bank Three"), ECF No. 1 (No. 18-177).
Consistent with the parties' agreed upon briefing schedule, on January 7, 2019, each bank filed an opposition, supported by voluminous attachments, to the government's motion. See Bank One's Opp'n to Gov't's Mot. Compel ("Bank One's Opp'n"), ECF No. 6 (No. 18-175); Bank Two's Opp'n to Gov't's Mot. Compel ("Bank Two's Opp'n"), ECF No. 3 (No. 18-176); Bank Three's Opp'n to Gov't's Mot. Compel ("Bank Three's Opp'n"), ECF No. 4 (No. 18-177). The government then filed a single omnibus reply, on February 4, 2019, with its own attachments. See Gov't's Omnibus Reply Supp. Mots. Compel Prod. ("Gov't's Reply"), ECF No. 14 (No. 18-175).[2] Each bank was permitted to file a sur-reply, and each of those, with more attachments, was submitted on February 26, 2019. See generally Bank One's Sur-Reply Opposing Mot. Compel ("Bank One's Sur-Reply"), ECF No. 18 (No. 18-175); Bank Two's Sur-Reply Opposing Mot. Compel ("Bank Two's Sur-Reply"); ECF No. 12 (No. 18-176); Bank Three's Sur-Reply Opposing Mot. Compel ("Bank Three's Sur-Reply"), ECF No. 12 (No. 18-177). In support of the banks, the Chinese Ministry of Justice ("MOJ") submitted two letters addressed to the Court. See, e.g. , Bank One's Opp'n, Ex. 3, Jan. 6, 2019 MOJ Ltr., ECF No. 6-3 (No. 18-175); Bank One's Sur-Reply, Ex. 3, Feb. 26, 2019 MOJ Ltr., ECF No. 18-4 (No. 18-175).
Following a March 5, 2019 hearing with the government and all three banks, the government and two of the banks-Bank One and Bank Two-were permitted to submit supplemental briefing on a personal jurisdiction issue specific to each bank. The government's supplemental briefs were filed on March 8, 2019, see Gov't's Suppl. Br. Personal Jurisdiction-Bank One ("Gov't's Suppl.-Bank One"), ECF No. 29 (No. 18-175); Gov't's Suppl. Br. Personal Jurisdiction-Bank Two ("Gov't's Suppl.-Bank Two"), ECF No. 25 (No. 18-176), and each bank's response was filed on March 12, 2019, see Bank One's Suppl. Br. Personal Jurisdiction ("Bank One's Suppl."), ECF No. 30 (No. 18-175); Bank Two's Suppl. Br. Personal Jurisdiction ("Bank Two's Suppl."), ECF No. 26 (No. 18-176).
Upon consideration of this weighty record, and for the following reasons, each of the government's three motions is granted.
I. BACKGROUND
The three subpoenas in this matter pertain to an investigation into [REDACTED]. See Gov't's Mot.-Bank One at 1[3] ; Gov't's Mot.-Bank Three at 1. As noted, [REDACTED] was a Hong Kong based *46 front company for North Korea's [REDACTED]. Gov't's Reply, Ex. 1, Decl. of Special Agent of the Federal Bureau of Investigation ("FBI Decl.") ¶ 9, ECF No. 14-1 (No. 18-175). The now-defunct front company purportedly was established by [REDACTED], a North Korean national, and [REDACTED], a Chinese national. Id.
A. [REDACTED] Transactions for [REDACTED]
Between October 2012 and January 2015, [REDACTED] used [REDACTED] for United States dollar transactions totaling $ 105,339,483.59. Gov't's Mot.-Bank One at 2; accord Gov't's Mot.-Bank Three at 2. Of that money, $ 45,779,669.50 traveled through a United States correspondent bank account of Bank One, which is a Chinese bank with [REDACTED] United States branches. Gov't's Mot.-Bank One at 2-3; Bank One's Opp'n at 1.[4] The Chinese government, or its affiliated enterprises, own [REDACTED] of Bank One. See Bank One's Opp'n at 17 n.13; see also Gov't's Reply, Ex. 2, Decl. of Professor of Law at George Washington University Law School ("Gov't's Expert Decl.") ¶ 99, ECF No. 14-2 (No. 18-175). Another $ 1,627,909.34 went through a correspondent bank account of Bank Two, which also is a Chinese Bank with a United States branch. Gov't's Mot.-Bank One at 2-3; Bank Two's Opp'n at 4. The Chinese government has a [REDACTED] ownership stake in Bank Two. Gov't's Expert Decl. ¶ 100. Finally, $ 57,931,904.75 was shuttled through a United States correspondent account of Bank Three, which is a Chinese bank without any United States branch, but which maintains [REDACTED] correspondent accounts in the United States. Gov't's Mot.-Bank Three at 2-3; Bank Three's Opp'n, Decl. of General Manager of [REDACTED] for Bank Three ("Bank Three GM Decl.") ¶¶ 7, 10, ECF No. 4-2 (No. 18-177). At least [REDACTED] of Bank Three's publicly traded shares are held by the Chinese government. Id. ¶ 9.
Many of these transactions were made after the Treasury Department's Office of Foreign Assets Control ("OFAC"), on [REDACTED], "designated" the [REDACTED] pursuant to Executive Order 13382. See Actions Taken Pursuant to Executive Order 13382, [REDACTED]. Executive Order 13382 authorizes the Secretary of State, the Secretary of Treasury, or "other relevant agencies," to designate, after consulting with their counterpart and the Attorney General, any individual or entity as having engaged "in activities or transactions that have materially contributed to, or pose a risk of materially contributing to, the proliferation of weapons of mass destruction or their means of delivery," as having "provided, or attempted to provide, financial, material, technological or other support for" any such transaction, or as being "owned or controlled by, or acting or purporting to act for or on behalf of" any already-designated individual or entity. See Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, Exec. Order 13382, 70 Fed. Reg. 38567 (July 1, 2005). As a designated entity, the [REDACTED]'s property interests in the United States are blocked, meaning that the [REDACTED]'s property may not be "transferred, paid, exported, withdrawn, or otherwise dealt in." Id. ; see also 31 C.F.R. § 544.201.[5] Designated entities *47 may apply to OFAC for a license exempting certain property from being blocked. 31 C.F.R. §§ 501.801 - 808, 504.501-508.
Based on [REDACTED]'s transactions through the United States financial market, the government is investigating [REDACTED] for three crimes: (1) money laundering, in violation of 18 U.S.C. § 1956 ; (2) violating an order issued under the International Economic Emergency Powers Act, such as Executive Order 13382, which is a violation of 50 U.S.C. § 1705 ; and (3) violating the Bank Secrecy Act. See Gov't's Mot.-Bank One at 4-5; accord Gov't's Mot.-Bank Three at 5.
B. The Investigatory Subpoenas
In aid of that investigation, on December 26, 2017 the United States Attorney for the District of Columbia sent Bank Three a subpoena under 31 U.S.C. § 5318(k)(3). See Bank Three GM Decl., Ex. 1, Admin. Subpoena, ECF No. 4-2 (No. 18-177).[6] That statutory provision authorizes the Secretary of the Treasury and the Attorney General to "issue a summons or subpoena to any foreign bank that maintains a correspondent account in the United States and request records related to such correspondent account, including records maintained outside of the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(A)(i). The subpoena sent to Bank Three sought all records, including "(a) signature cards; (b) documentation of account opening; (c) account ledger cards; (d) periodic account statements; (e) due diligence (including invoices); and (f) records (copied front and back) of all items deposited, withdrawn, or transferred," "from January 1, 2012, through the present," "relating to correspondent banking transactions for [REDACTED]" and "relating to correspondent banking transactions" for a specified account thought to be used by [REDACTED]. See Admin. Subpoena.
The next day, Bank One's and Bank Two's local branch each received identical grand jury subpoenas. See Gov't's Mot.-Bank One at 5; see also Bank One's Opp'n, Ex. 1, Grand Jury Subpoena, ECF No. 6-1 (No. 18-175). Those subpoenas commanded that a representative of each bank appear to testify before the grand jury, and bring before the grand jury records, including "(a) signature cards; (b) documentation of account opening; (c) account ledger cards; (d) account statements; (e) due diligence (including invoices); and (f) records (copied front and back) of all items deposited, withdrawn, or transferred," dated between January 1, 2012 and December 26, 2017, related to any account belonging to [REDACTED] or related to a specific account believed to be associated with [REDACTED]. See Grand Jury Subpoena.
C. Negotiating Alternatives to the Subpoenas
In January 2018, representatives from Bank Three met with the China Banking Regulatory Commission ("the Commission") and the People's Bank of China ("People's Bank"), which together regulate Chinese banking, about the subpoena and were told that the only way under Chinese law that the bank could comply was *48 through the process established under the Agreement Between the Government of the United States of America and the Government of the People's Republic of China on Mutual Legal Assistance in Criminal Matters ("MLAA"), June 19, 2000. See Bank Three GM Decl. ¶¶ 18-20. In March 2018, Bank Three representatives again met with Chinese officials, including officials from the Commission, the People's Bank, and the MOJ, the latter of which is designated under the MLAA as the Chinese authority responsible for MLAA communications. See Bank Three GM Decl. ¶ 20; MLAA Art. 2. The Chinese authorities repeated that Bank Three should ask the United States government to request the subpoenaed records through the MLAA process and informed Bank Three that the MOJ would respond quickly to an MLAA request. Bank Three GM Decl. ¶¶ 20a, 20b. The MOJ's advice was memorialized in a March 22, 2018 letter sent to Bank Three, which relayed that the MOJ would timely review and handle an MLAA request. Bank Three GM Decl., Ex. 2, Mar. 22, 2018 MOJ Ltr., ECF No. 4-2 (No. 18-177). The same letter explained that if Bank Three "provide[s] relevant client information to the U.S. DOJ directly, the banking regulatory authorities will impose administrative penalties and fines on you, and you may bear civil or criminal liabilities depending on your situation." Id.
Still in March 2018, United States counsel for Bank Three shared the MOJ's letter with, and sent a letter on behalf of Bank Three, to the United States government explaining that Bank Three had been advised that under Chinese law, the MLAA is the exclusive vehicle for the bank to produce the requested records. Bank Three GM Decl. ¶ 23; Bank Three's Opp'n, Decl. of Bank Three's U.S. Counsel ("Bank Three U.S. Counsel Decl."), Ex. 3, Mar. 23, 2018 U.S. Counsel Ltr., ECF No. 4-1 (No. 18-177). Bank Three's counsel assured the United States government that the MOJ "would quickly respond to such a [MLAA] request" and that the bank was "ready and willing to provide [the records] to MOJ," Mar. 23, 2018 U.S. Counsel Ltr. at 1, having taken steps to preserve the requested records, id. at 2.
Bank One claims to have expressed a willingness to facilitate an MLAA request around the same time. Bank One's Opp'n at 3-4. Additionally, Bank Two "has given its assurances that it will produce the requested documents within days of a request through the MLAA." Bank Two's Opp'n at 16.
Following these communications, a delegation from the Department of Justice visited China-once in April 2018 and again in August 2018-to discuss "China's repeated failure to respond to MLAA requests-which necessitated the United States to proceed through Bank of Nova Scotia subpoenas and other authorities under U.S. law." Gov't's Reply, Ex. 3, Decl. of Associate Director of the Office of International Affairs of Department of Justice's Criminal Division ("DOJ Decl.") ¶ 17, ECF No. 14-3 (No. 18-175). These discussions did not result in the production of the requested documents.
D. The Government's Motions to Compel
As already outlined, in November 2018, the United States government filed a motion to compel compliance with each of the three subpoenas. See generally Gov't's Mot.-Bank One; Gov't's Mot.-Bank Two; Gov't's Mot.-Bank Three. Briefing continued through the end of February 2019, at which time the banks all filed a sur-reply. See generally Bank One's Sur-Reply; Bank Two's Sur-Reply; Bank Three's Sur-Reply.
While briefing was underway, the MOJ sent two letters to the Court. In the first, *49 the MOJ committed to "timely review and handle the requests for assistance sought by DOJ in accordance with the [MLAA] and applicable domestic law. For the request in line with the [MLAA], China will provide the assistance to the United States accordingly." See, Jan. 6, 2019 MOJ Ltr. at 4. In the second, the MOJ restated that "if the DOJ makes a MLA[A] request in the present case, the MOJ will promptly review and process it. To be more specific, if such a US request complies with the applicable provisions of the [Law of the People's Republic of China on International Legal Assistance in Criminal Matters] and the MLAA, the MOJ will promptly transfer the request to Competent Authorities of China for further review and execution." Feb. 26, 2019 MOJ Ltr. at 3.
On March 5, 2019, the Court held a hearing with all three banks. Following the hearing, the government, Bank One, and Bank Two submitted supplemental briefing about whether those two banks, in the process of seeking authorization from the Board of Governors of the Federal Reserve System ("Federal Reserve") to open United States branches, had filed a consent to personal jurisdiction that covered this matter. See generally Gov't's Suppl.-Bank One; Gov't's Suppl.-Bank Two; Bank One's Suppl.; Bank Two's Suppl.
With the briefing and hearing now complete, the motions are ripe for resolution.
II. LEGAL STANDARD
If compliance with a grand jury subpoena "would be unreasonable or oppressive," a court may quash or modify the subpoena. FED. R. CRIM. P. 17(c)(2). A subpoena might be unreasonable or oppressive if compliance would violate foreign law. In re Grand Jury Subpoena , 912 F.3d 623, 633 (D.C. Cir. 2019). Issues of foreign law are questions of law and, as the parties relying on foreign law, the banks must show that Chinese law would prevent compliance with the court's order. Id. (citing In re Sealed Case , 825 F.2d 494, 498 (D.C. Cir. 1987) ); see also United States v. R. Enterprises, Inc. , 498 U.S. 292, 301, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991) ("[A] grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance.").
As for the administrative subpoena, the court's role "is a strictly limited one." Resolution Tr. Corp. v. Thornton , 41 F.3d 1539, 1544 (D.C. Cir. 1994). Courts "consider only whether 'the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.' " Id. (quoting United States v. Morton Salt Co. , 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950) ). "Accordingly, a court must look to the authorizing statute in determining whether a given subpoena may be enforced." United States v. Apodaca , 251 F.Supp.3d 1, 8 (D.D.C. 2017) ; see also United States v. Newport News Shipbuilding & Dry Dock Co. , 837 F.2d 162, 165-66 (4th Cir. 1988) ("Here, the subpoena is deficient because it exceeds the proper scope of DCAA's statutory authority."). Yet, the Court's inquiry "is neither minor nor ministerial." Resolution Tr. Corp. , 41 F.3d at 1544.
III. DISCUSSION
The government's motions to compel compliance present two principle issues: First, whether the subpoenas are enforceable, which, in turn, depends on whether the banks are subject to this Court's jurisdiction and whether the subpoena issued to Bank Three exceeds the government's authority under 31 U.S.C. § 5318. Second, even if the subpoenas are enforceable against the three banks, whether such enforcement *50 is reasonable, as a matter of international comity. Those issues are addressed in that order.
A. Personal Jurisdiction
To direct an entity, or its representative, to come before a grand jury, the district court must have personal jurisdiction over the entity. In re Sealed Case ("Sealed Case II "), 832 F.2d 1268, 1272 (D.C. Cir. 1987) abrogated on other grounds by Braswell v. United States, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). That limitation on a court's authority to proceed against a party enforces the Constitution's Due Process Clauses. Goodyear Dunlop Tires Operations, S.A. v. Brown , 564 U.S. 915, 923, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011). As explained below, each bank is subject to the personal jurisdiction of this Court because both Bank One and Bank Two have consented to the exercise of such jurisdiction and, even if those two banks had not given consent, all three banks have sufficient minimum contacts with the relevant forum, which here is the United States, for the exercise of such jurisdiction.
1. Consent to Jurisdiction by Bank One and Bank Two
For two of the banks-Bank One and Bank Two-personal jurisdiction is straightforward: each has consented to personal jurisdiction. Those two banks, while applying to the Federal Reserve to open a branch in the United States, "consent[ed] to the jurisdiction of the federal courts of the United States and of all United States governmental agencies, departments and divisions for purposes of any and all claims made by, proceedings initiated by, or obligations to, the United States, the Board, and any other United States governmental agency, department or division, in any matter arising under U.S. Banking Law." Gov't's Suppl.-Bank One, Ex. A., Consent to Jurisdiction-Bank One at 1, ECF No. 29-1 (No. 18-175); accord Gov't's Suppl.-Bank Two, Ex. A., Consent to Jurisdiction-Bank Two, ECF No. 25-1 (No. 18-176).[7] Each consent expressly defines "U.S. Banking law" to include, among other things, the Bank Secrecy Act. See Consent to Jurisdiction-Bank One at 2-3 n.2; Consent to Jurisdiction-Bank Two at 1-2 n.2. Those consents apply here, the government argues, because the subpoenas have been issued in conjunction with an investigation into possible violations of the Bank Secrecy Act, namely: 31 U.S.C. § 5318. Gov't's Suppl.-Bank One at 3-4; Gov't's Suppl.-Bank Two at 3-4.[8]
Bank One argues that consent to the "jurisdiction of the federal courts of the United States" does not mean what it says, but rather means "consent to the jurisdiction of some federal court (e.g., a federal court having a connection to the matter at issue) though not necessarily any and every federal court." Bank One's Suppl. at 4 (emphasis in original).[9] The *51 limitation that Bank One tries to read into the consent does not exist. Additionally, in this case, for reasons explained in Section III.A.2, infra , federal judicial districts cannot be distinguished for purposes of personal jurisdiction.
Bank Two, for its part, tries to avoid the consent by arguing that the Bank Secrecy Act cannot apply here because [REDACTED] is not a financial institution under the Bank Secrecy Act, the Bank Secrecy Act does not apply extraterritorially to an entity, like [REDACTED], without United States operations, and the consent should be read as limited only to instances in which the bank itself is accused of wrongdoing. Bank Two's Suppl. at 6-7. Bank Two's arguments elide too much context. First, [REDACTED] is not the only subject of the investigation. [REDACTED] is another. Second, the government's investigation is still before the grand jury. At this stage, the government need not prove violations of the Bank Secrecy Act, or who may have violated the statute, for the enforcement action to arise under United States banking law. "[T]o establish jurisdiction for purposes of enforcing a grand jury subpoena, the [government] need not prove what would be necessary to confer jurisdiction over the companies for purposes of trial.... [S]o stringent a requirement 'might well invert the grand jury's function, requiring that body to furnish answers to its questions before it could ask them." Sealed Case II , 832 F.2d at 1274 (quoting In re Grand Jury Proceedings (Harrisburg Grand Jury 79-1) , 658 F.2d 211, 214 (3d Cir. 1981) ); accord In re Grand Jury Subpoena , 912 F.3d at 632 ; see also In re M.H. , 648 F.3d 1067, 1071 (9th Cir. 2011) ("M.H. argues that-for a number of reasons-[a Bank Secrecy Act regulation] does not apply to him, so he is not required to comply with the grand jury's subpoena.... But at this point in its investigation, the Government need not prove the regulation or the [Bank Secrecy Act] apply."). Finally, nowhere does the consent's text suggest that the bank must itself be the entity investigated for violating United States banking law. Simply put, the motions to compel are "proceedings initiated by ... the United States ... in [a] matter arising under U.S. Banking law."
In short, both Bank One and Bank Two have expressly consented to the exercise of personal jurisdiction in this proceeding.
2. Each Bank Has Sufficient Minimum Contacts with the Relevant Forum for the Exercise of Personal Jurisdiction
If, however, the consent forms are ineffectual, Bank One and Bank Two are on similar footing as Bank Three, which has never has submitted any consent to the Federal Reserve. In that case, personal jurisdiction over the banks may take one of two forms: "general or all-purpose jurisdiction" or "specific or case-linked *52 jurisdiction." Goodyear , 564 U.S. at 919, 131 S.Ct. 2846. Here, the government argues only that the banks are subject to specific personal jurisdiction in this Court. Gov't's Mot.-Bank One at 9-10 n.7; Gov't's Mot.-Bank Three at 10 n.9. Specific personal jurisdiction has two prerequisites: the entity must have "[1] certain minimum contacts with [the forum] such that [2] the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Daimler AG v. Bauman , 571 U.S. 117, 126, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014). A court may exercise specific jurisdiction over an entity only as to matters that "aris[e] out of or relat[e] to the defendant's contacts with the forum. " Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty. , --- U.S. ----, 137 S.Ct. 1773, 1780, 198 L.Ed.2d 395 (2017) (emphasis in original). "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and therefore is subject to the State's regulation." Id. (quoting Goodyear , 564 U.S. at 919, 131 S.Ct. 2846 ).
Each of the three banks contests that the necessary contacts with District of Columbia are present and therefore each contends that being subjected to jurisdiction in the District of Columbia is unfair. The government considers the banks' focus on the District of Columbia as misplaced since the relevant forum for consideration of personal jurisdiction is the United States as a whole. Gov't's Mot.-Bank One at 10; Gov't's Mot.-Bank Three at 10. The Court is persuaded that the government is correct and that the banks' contacts with the United States are the measure of whether personal jurisdiction may be exercised here.
a) Defining the Relevant Forum
The first step in determining whether a party has adequate contacts for personal jurisdiction is identifying the forum with which the contacts must be assessed. For a case subject to the Fourteenth Amendment's Due Process Clause, personal jurisdiction depends on the party's "relationship to the forum State." Bristol-Myers Squibb , 137 S. Ct. at 1779. Conversely, for a case governed by the Fifth Amendment's Due Process Clause, the relevant forum is the United States. Livnat v. Palestinian Authority , 851 F.3d 45, 54-55 (D.C. Cir. 2017). As the D.C. Circuit explained in Livnat , "[t]he only difference in the personal-jurisdiction analysis under the two Amendments is the scope of the relevant contacts: Under the Fourteenth Amendment, which defines the reach of state courts, the relevant contacts are state-specific. Under the Fifth Amendment, which defines the reach of federal courts, contacts with the United States as a whole are relevant." Id. at 55 (emphasis in original).
Which constitutional amendment governs depends on how service may be accomplished. See Livnat , 851 F.3d at 54 (explaining that the constitutional analysis was governed by Fifth Amendment because Federal Rule of Civil Procedure 4(k)(2), rather than Rule 4(k)(1), applied). When the "court exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process" the Fourteenth Amendment, and thus the "requirement of 'minimum contacts' with a forum state is inapplicable." S.E.C. v. Bilzerian , 378 F.3d 1100, 1106 n.8 (D.C. Cir. 2004). Instead, the Fifth Amendment applies. Livnat , 851 F.3d at 54 ; see also Abelesz v. OTP Bank , 692 F.3d 638, 655-56 (7th Cir. 2012) ("Plaintiffs have attempted to support general personal jurisdiction over MKB and OTP by examining all of their contacts with the United States as a whole.... Under *53 Rule 4(k)(2) of the Federal Rule of Civil Procedure, plaintiffs may do so, at least regarding their claims arising under federal or international law."); United Elec. v. 163 Pleasant Street Corp. , 960 F.2d 1080, 1085 (1st Cir. 1992) ("When a district court's subject matter jurisdiction is founded upon a federal question, the constitutional limits of the court's personal jurisdiction are fixed, in the first instance, not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment."); Wultz v. Islamic Republic of Iran ("Wultz I "), 755 F.Supp.2d 1, 32 (D.D.C. 2010) (ruling that the Fifth Amendment governed personal jurisdiction for case brought under Antiterrorism Act, which includes a national-service-of-process provision).
The Fifth Amendment controls here, the government contends, because the Court's power to enforce the three subpoenas derives from federal authority permitting nationwide service of process. See Gov't's Mot.-Bank One at 10 ("When considering specific personal jurisdiction under a federal statute that allows for nationwide service, such as a grand jury subpoena, the forum for which a court examines the party's contacts is the entire United States, rather than a specific district."); Gov't's Mot.-Bank Three at 10 ("When considering specific personal jurisdiction under a federal statute that allows for nationwide service, such as an administrative subpoena issued pursuant to 31 U.S.C. § 5318(k)(3), the forum for which a court examines the party's contact is the entire United States, rather than a specific district."). The merits of the government's position are considered first for the grand jury subpoenas and second for the administrative subpoena.
i) Grand Jury Subpoenas
Bank One's and Bank Two's initial opposition briefs each challenged being subject to this Court's exercise of personal jurisdiction, but, at best, each ignored that the United States might be the relevant forum for minimum contacts.[10] Bank One conceded "avail[ing] itself of the U.S. banking system to process certain transactions," but argued that availment did not matter for personal jurisdiction because "the discovery sought in the Subpoena is not limited to those transactions...." Bank One's Opp'n at 6. In certain respects, Bank One's brief actually signaled agreement that the relevant forum is the United States. See Bank One's Opp'n at 4-5 ("In cases involving the enforcement of a grand jury subpoena, courts need not look to a state's long-arm statute when the subject of a grand jury's investigation is the possible violation of federal statutes."). Similarly, Bank Two contested this Court's jurisdiction because the bank's contact with the District of Columbia is incidental to the records sought. Bank Two's Opp'n at 38-39. As an initial matter, then, these two banks have waived any argument against the United States being the relevant forum. In re Asemani , 455 F.3d 296, 300 (D.C. Cir. 2006) ("Asemani's first argument ... is waived because it was made for the first time in his reply brief.").
Only in their sur-replies did Bank One and Bank Two offer a response to the government's contention that the jurisdictional forum is the United States. Even indulging those belated arguments, they fail on the merits. In its sur-reply, Bank One notes that the government is investigating possible violations of 18 U.S.C. § 1956, 50 U.S.C. § 1705, and 31 U.S.C. § 5318, and that none of those three statutes *54 permits nationwide service of process. Bank One's Sur-Reply at 3. Similarly, Bank Two argues that "to the extent that the Government can identify applicable federal criminal statutes that permit nationwide services of process, it still would need to demonstrate that these statutes permit the exercise of jurisdiction over non-parties who are not accused of having violated the statutes." Bank Two's Sur-Reply at 11. Those criminal statutes, however, are irrelevant. This is an action to enforce subpoenas and, thus, jurisdiction depends on whether the subpoenas may be served nationwide. See Gucci America Inc. v. Weixing Li ("Gucci II "), 768 F.3d 122, 142 n.21 (2d Cir. 2014) (identifying Federal Rule of Civil Procedure 45(b)(2)'s national service provision as the relevant authority for whether jurisdiction depends on contacts with the entire United States); see also In re Sealed Case , 141 F.3d 337, 340-41 (D.C. Cir. 1998) (determining jurisdiction to transfer a motion to quash a civil subpoena based on text of Federal Rule of Civil Procedure 45 ).
Relegated to a single sentence of a footnote, see Bank One's Sur-Reply at 4 n.2, Bank One conveys an understanding that jurisdiction here does not turn on the specific crimes the grand jury is investigating, but rather is a function of Federal Rule of Criminal Procedure 17, which governs federal grand jury subpoenas, see Dep't of Justice Manual § 9-11.140 ("Subpoenas in Federal proceedings, including grand jury proceedings, are governed by Rule 17 of the Federal Rule of Criminal Procedure."). Under that procedural rule, "[a] subpoena requiring a witness to attend a hearing or trial may be served at any place within the United States." FED. R. CRIM. P. 17(e). Plainly, a grand jury subpoena may be served nationwide.
Still, Bank One maintains that Federal Rule of Criminal Procedure 17(e) does not apply here because that rule "allow[s] nationwide service only for subpoenas to compel attendance at a hearing or trial." Bank One's Sur-Reply at 4 n.2. Bank One's argument is bewildering because the subpoena Bank One received was a "Subpoena to Testify before a Grand Jury," which commanded a witness "to appear in this United States district court at the time, date, and place shown below." See Grand Jury Subpoena. While the subpoena also required the witness to bring documents, id. , a criminal subpoena may include such an order. See FED. R. CRIM. P. 17(c). In the end, compelling Bank One to comply might result only in the production of documents, but that is true only as a matter of courtesy. The government's cover letter, sent with the subpoena, communicated that, "if it is more convenient for you, you may send the requested records to the undersigned United States Attorney in lieu of personally appearing before the Grand Jury on the date indicated." See Bank One's Opp'n, Ex. 1, Grand Jury Subpoena Ltr., ECF No. 6-1 (No. 18-175).
At bottom, Federal Rule of Criminal Procedure 17(e) allows for the grand jury subpoena that Bank One and Bank Two each received to be served nationwide. Therefore, personal jurisdiction depends on each banks' contacts with the United States.
ii) Administrative Subpoena
Like Bank One and Bank Two, Bank Three's initial opposition brief gave short-shrift to the possibility that the relevant jurisdictional forum is the United States. While Bank Three spent several pages discounting its contact with the District of Columbia, see Bank Three's Opp'n at 11-15, the bank spent just a single footnote attacking that personal jurisdiction to enforce an administrative subpoena that can be served nationwide depends on national contacts, id. at 15 n.4. D.C. Circuit precedent, *55 Bank Three insisted, did not support the government's position. Id. On that front, Bank Three is wrong. See Bilzerian , 378 F.3d at 1106 n.8 ("The Circuit has held that the requirement of 'minimum contacts' with a forum state is inapplicable where the court exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process.... In such circumstances, minimum contacts with the United States suffice.") (citing Briggs v. Goodwin , 569 F.2d 1, 8-10 (D.C. Cir. 1977) rev'd sub nom. on other grounds, Stafford v. Briggs, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980) ); see also Bricklayers & Trowel Trades Int'l Pension Fund v. Kel-Tech Constr., Inc. , 319 F.Supp.3d 330, 339 (D.D.C. 2018) (citing Bilzerian for same conclusion); Bally Gaming, Inc. v. Kappos , 789 F.Supp.2d 41, 45-46 (D.D.C. 2011) (same).
In light of this precedent, Bank Three's sur-reply changes course, arguing that 31 U.S.C. § 5318(k)(3)(A) "does not expressly authorize nationwide service." Bank Three's Sur-Reply at 20 (emphasis in original). That tardy argument is waived. In re Asemani , 455 F.3d at 300 ("Asemani's first argument ... is waived because it was made for the first time in his reply brief.").
Even if not waived, the argument Bank Three advances is unpersuasive. A subpoena under 31 U.S.C. § 5318(k)(3)(A)(ii) may be served "on the foreign bank in the United States if the foreign bank has a representative in the United States." That text does not introduce geographic limits on where in the United States service may be accomplished. True, service may be accomplished in the United States only "if the foreign bank has a representative in the United States," but that language is not meaningfully restrictive as all foreign banks that maintain a correspondent account in the United States "shall maintain ... the name and address of a person who resides in the United States and is authorized to accept service of legal process for records regarding the correspondent account." 31 U.S.C. § 5318(k)(3)(B)(i). That provision permits the representative to reside anywhere in the United States. Thus, together, the statute requires that all foreign banks with a correspondent account in the United States must have a representative in the United States, and service may be accomplished wherever that representative is stationed.
Comparing 31 U.S.C. § 5318(k)(3) against other parts of the same section, in Bank Three's view, reinforces the bank's restrictive reading. Bank Three's Sur-Reply at 21. Just the opposite is true. Under 31 U.S.C. § 5318(a)(3), (4), the Secretary of Treasury may summon the representative of a financial institution to appear and produce a subset of the institution's financial records. That summons "may require that books, papers, records, or other data stored or maintained at any place be produced at any designated location in any State or in any territory or other place subject to the jurisdiction of the United States not more than 500 miles distant from any place where the financial institution or nonfinancial trade or business operates or conducts business in the United States." 31 U.S.C. § 5318(c)(1). Thus, Congress expressly limited service provisions elsewhere in the statute. Similar territorial limits are notably absent from 31 U.S.C. § 5318(k)(3), reflecting an intended broader reach.
Elsewhere in the statute, the Attorney General is authorized to initiate compliance proceedings against a financial institution's representative if the financial institution refuses the Secretary of Treasury's summons issued under 31 U.S.C. § 5318(a)(3), (4). Id. § 5318(e). Process for the compliance proceeding "may be *56 served in any judicial district in which such person may be found." Id. § 5318(e)(5). Bank Three sees this text as the sort of express authorization of nationwide service missing from 31 U.S.C. § 5318(k)(3), Bank Three's Sur-Reply at 21, but permitting service in "in any judicial district" is no broader than permitting service "in the United States." Moreover, the statute explicitly confers jurisdiction over the compliance proceeding to the court sitting either where "the investigation which gave rise to the summons is being or has been carried on; the person summoned is an inhabitant; or the person summoned carries on business or may be found." See 31 U.S.C. § 5318(e)(2). Bank Three considers this a "broad jurisdictional provision" and underscores that "no such broad language-indeed, no language specifically addressing personal jurisdiction-exists in Section 5318(k)." Bank Three's Sur-Reply at 21. Yet, Bank Three has turned the actual import of 31 U.S.C. § 5318(e)(2) upside down. Section 5318(e)(2) limits jurisdiction to three districts, despite 31 U.S.C. § 5318(e)(5)'s nationwide service provision. No similar limits were attached to a proceeding to enforce a subpoena under 31 U.S.C. § 5318(k)(3).
Thus, Congress provided for nationwide service of a subpoena issued to a foreign bank that maintains a correspondent account in the United States. Personal jurisdiction over Bank Three, like Bank One and Bank Two, depends on the bank's contacts with the United States.
b) Minimum Contacts
Moving to each bank's United States contacts, personal jurisdiction exists only if each bank has " 'purposefully availed itself of the privilege of conducting activities within the forum State' or [ ] purposefully directed its conduct into the forum States." Bristol-Myers Squibb , 137 S.Ct. at 1785-86 (quoting J. McIntyre Machinery, Ltd. v. Nicastro , 564 U.S. 873, 877, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011) ). For purposes of jurisdiction to enforce a subpoena, the government need only show "that there is a reasonable probability it will succeed in establishing the fact necessary for the exercise of jurisdiction." Sealed Case II , 832 F.2d at 1274 (quoting Marc Rich & Co. v. United States , 707 F.2d 663, 670 (2d Cir. 1983) ).
The government hangs personal jurisdiction here on the banks having "availed themselves of the privileges of conducting transactions in U.S. dollars via correspondent accounts in the United States." Gov't's Mot.-Bank One at 12; accord Gov't's Mot.-Bank Three at 12-13. In particular, between October 2012 and January 2015, [REDACTED] conducted: 323 transactions through Bank One's United States correspondent account, worth $ 45,779,669.50, see Gov't's Mot.-Bank One at 2-3; see also FBI Decl. ¶ 13; 15 transactions through Bank Two's United States correspondent account, worth $ 1,627,909.34, see Gov't's Mot.-Bank One at 2-3; see also FBI Decl. ¶ 13; and 388 transactions through Bank Three's correspondent account, worth $ 57,931,904.75, see Gov't's Mot.-Bank Three at 2-3; see also FBI Decl. ¶ 13.
Previously, the D.C. Circuit has described a bank that does "considerable business in the United States" as "plainly [having] the 'minimum contacts' with this country to establish jurisdiction." Sealed Case II , 832 F.2d at 1273 n.3. Given that the banks' respective opposition briefs fixated on contacts with the District of Columbia, none disputed that the correspondent banking activity qualifies as purposeful availment of the United States. Instead, to the extent any discussed national contacts, Bank One *57 admitted that it "has availed itself of the U.S. banking system to process certain transactions." Bank One's Opp'n at 6. Similarly, Bank Two, to create distance from the District of Columbia, highlighted that "[t]o the extent [Bank Two] has any contacts with the United States it is with New York, not Washington D.C." Bank Two's Opp'n at 38. Finally, Bank Three confessed to "maintain[ing] correspondent accounts with banks in the United States, including the account identified in the subpoena, to process U.S. dollar transactions." Bank Three's Opp'n at 4 (citing Bank Three GM Decl. ¶ 10); id. at 14-15 ("The government also suggests that this Court has personal jurisdiction because [Bank Three] has engaged in transactions through its correspondent account in New York.... But those transactions have no nexus to the District of Columbia and thus cannot give rise to personal jurisdiction there."). Of course, since the relevant forum is the United States, each bank's connections with any part of the country suffice.
Bank Three cites one case from this district ruling that "[t]he Court ... is at a loss as to how the existence of [correspondent] bank accounts in New York can possibly establish the banks' presence in the District of Columbia. " Bank Three's Opp'n at 14 (quoting Day v. Cornér Bank (Overseas) Ltd. , 789 F. Supp. 2d 150, 156 (D.D.C. 2011) ) (emphasis in original). Cornér Bank is irrelevant twice over. First, the quoted passage pertained to general jurisdiction. Cornér Bank , 789 F.Supp.2d at 155-57. That same distinction renders two other cases Bank Three cites inapt. See In re Terrorist Attacks on Sept. 11, 2001 , 714 F.3d 659, 680 (2d Cir. 2013) ("Furthermore, we conclude that the alleged use of correspondent bank accounts and the maintenance of a website that allows account holders to manage their accounts are insufficient to support the exercise of general personal jurisdiction over NCB."); Abelesz , 692 F.3d at 658 ("[M]any courts have soundly rejected the suggestion that a correspondent banking relationship is sufficient to support general jurisdiction over a foreign defendant."). Second, in Cornér Bank the Court engaged in a personal jurisdiction analysis under the Fourteenth, rather than the Fifth, Amendment. Cornér Bank, 789 F.Supp.2d at 155 (treating the District of Columbia as the relevant jurisdictional forum); id. at 157 ("Because this case is before the Court based on diversity jurisdiction ... the Court looks to DC's long-arm statute.").
Of course, the banks' United States banking activity must relate to the matter over which the Court will exercise jurisdiction. See Bristol-Myers Squibb, 137 S.Ct. at 1786. Without that connection, jurisdiction is missing. See Leibovitch v. Islamic Republic of Iran , 852 F.3d 687, 690 (7th Cir. 2017) (refusing to exercise personal jurisdiction because "subpoenas issued in this case are not tailored to the banks' presence or activities in the United States"); Wultz I , 755 F.Supp.2d at 33-34 (D.D.C. 2010) (distinguishing between banks with knowledge that customer accounts were funding terrorist activity and banks without such knowledge for purposes of personal jurisdiction over banks sued under the Antiterrorism Act); Tamam v. Fransabank Sal , 677 F.Supp.2d 720, 727-28 (S.D.N.Y. 2010) (rejecting specific personal jurisdiction despite correspondent banking activity because the complaint did not allege that any of the defendants transferred money through the correspondent accounts). The opposite, however, also is true: correspondent banking activity suffices for specific personal jurisdiction when the exercise of that jurisdiction pertains to the correspondent *58 banking activity. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL , 732 F.3d 161, 170-71 (2d Cir. 2013) (concluding that personal jurisdiction existed based on correspondent banking activity when use of correspondent accounts were "part of the principal wrong at which the plaintiffs' lawsuit is directed"); Gucci America, Inc. v. Weixing Li ("Gucci III "), 135 F.Supp.3d 87, 97-99 (S.D.N.Y. 2015) (finding that court had jurisdiction to enforce Rule 45 subpoena against Bank of China for records evidencing conduct directly related to the alleged injury); Correspondent Servs. Corp. v. J.V.W. Inves. Ltd. , 120 F.Supp.2d 401, 405 (S.D.N.Y. 2000) (finding that when correspondent banking activity "is at the very root of the action" it may "give[ ] rise to personal jurisdiction"). Each subpoena in this case seeks records about [REDACTED]'s use of the three banks' correspondent accounts to conduct transactions in the United States. Indeed, [REDACTED]'s use of the United States financial system is "the gravamen of this case." Gov't's Reply at 11.
Accordingly, the subpoenas are directly related to the minimum contacts that permit the exercise of jurisdiction.
c) Fair Play and Substantial Justice
Finally, the exercise of personal jurisdiction over any of the banks must not "offend traditional notions of fair play and substantial justice." Goodyear , 564 U.S. at 923, 131 S.Ct. 2846. Said differently, the parties must have "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." Livnat , 851 F.3d at 48. Whether jurisdiction is fair and just accounts for "the burden on the defendant, the interest of the forum State, and the plaintiff's interest in obtaining relief" as well as "efficient resolution of controversies" and "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction." Asahi Metal Industry Co., Ltd. v. Superior Court of Cal., Solano Cty. , 480 U.S. 102, 113, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Any party that has constitutionally sufficient contacts with a forum "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King Corp. v. Rudzewicz , 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).
Generally, the banks advance that the exercise of jurisdiction here would be unfair because the potential upshot of jurisdiction is a burdensome order compelling the production of records that are housed in China, see Bank One's Opp'n at 7, and cannot be disclosed without violating Chinese law, see id. at 8; Bank Two's Opp'n at 38; Bank Three's Opp'n at 16. Imposing such a burden is unnecessary, in the banks' view, given that the MLAA is an efficient alternative, see Bank One's Opp'n at 9-10; Bank Two's Opp'n at 38; Bank Three's Opp'n at 16-17. Additionally, forcing the banks to divulge client information undermines China's interests in a secure banking system, see Bank One's Opp'n at 8, and might lead to reciprocal consequences, Bank Three's Opp'n at 17.
None of the banks' own interests, or those of China, match the United States' much stronger interest in the exercise of jurisdiction. Consequently, subjecting the banks to this Court's jurisdiction is, simply put, not unfair. Indeed, two of the banks consented to personal jurisdiction for matters arising under United States banking law. See Consent to Jurisdiction-Bank One; Consent to Jurisdiction-Bank Two. Beyond that, each bank has funneled over a million dollars through the United States on behalf of [REDACTED]. As the Second Circuit has said about such correspondent banking activity, "[i]t should hardly be unforeseeable to a bank *59 that selects and makes use of a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to, and arising from, that use." Licci , 732 F.3d at 171-72. As another Judge on this Court has held, "[w]ith regard to [Bank of China's] capacity to foresee suit in the District of Columbia, the Court notes that [Bank of China] is a sophisticated international financial institution that plaintiffs allege 'has branches in California and New York, does extensive business throughout the United States[,] and holds significant assets in the United States.' ... As such, it is reasonable to presume that [Bank of China] is fully aware of U.S. law concerning financial institutions...." Wultz I , 755 F.Supp.2d at 34. All the same considerations hold here.
Nor would enforcement impose onerous logistical burdens on any of the banks. The government has offered Bank One and Bank Two the option of simply mailing the requested records. See Grand Jury Subpoena Ltr. ("Although you are not required to do so, if it is more convenient for you, you may send the requested records to the undersigned United States Attorney in lieu of personally appearing before the Grand Jury on the date indicated."). Similarly, the administrative subpoena calls only for Bank Three to produce records. Admin. Subpoena ("Compliance can be made by mailing the requested documents via courier...."). None of the banks contends that locating those records will be difficult. To the contrary, Bank Two has given assurances that the requested documents can be collected in days, see Bank Two's Opp'n at 16; Bank Two's Sur-Reply at 3, and Bank Three "took steps to collect and preserve documents" shortly after receiving the subpoena, see Bank Three GM Decl. ¶ 14; accord Mar. 23, 2018 U.S. Counsel Ltr. at 1-2. Bank One estimated that the documents could be collected within 30 days. Mar. 5, 2019 Tr. at 47:3-7, ECF No. 28 (No. 18-175). With the documents already, or easily, collected, now the banks need only put them in the mail, hardly a burden. To the extent that further legal issues will arise from enforcement of the subpoenas, the well-resourced banks are all fully able to ensure adequate representation of their interests.
Additionally, for reasons discussed more thoroughly in Section III.C.2, infra , the remainder of the banks' specific arguments are unavailing: the risk that any of the banks will be penalized in China for complying with the subpoenas is overblown; the United States, which seeks these records as part of an investigation into North Korea's nuclear weapons program, does not have an alternative route to obtain them since the MLAA, at least for banking records, is unproductive; and while China does have a legitimate interest in a sound financial system, Chinese law permits the disclosure of banking records in analogous circumstances and therefore appreciates that banking systems do not crumble because the government can obtain some records for law enforcement purposes.
* * * * *
All told, each bank has purposefully availed itself of the United States financial market through correspondent banking activity, including transactions on behalf of [REDACTED]. The subpoenas are for records related to that activity. Nothing about the exercise of jurisdiction is unjust under those circumstances.
B. Statutory Authority for Administrative Subpoena
Separate from personal jurisdiction, Bank Three argues that the 31 U.S.C. § 5318(k)(3) subpoena it received is unenforceable because the subpoena goes beyond what the statute permits. In other *60 words, the bank contends that the inquiry is not within the agency's authority. See Resolution Tr. Corp. , 41 F.3d at 1544.
Under the USA Patriot Act, Congress authorized the Attorney General and Secretary of Treasury to subpoena records from a foreign bank that maintains a correspondent account in the United States, but only "records related to such correspondent account, including records maintained outside the United States relating to the deposit of funds into the foreign bank." 31 U.S.C. § 5318(k)(3)(a)(i). According to Bank Three, the subpoena in this case, which requests "[a]ll documents relating to correspondent banking transactions for [REDACTED]" as well as "[a]ll documents relating to correspondent banking transactions for" a specific account number, see Admin. Subpoena, "is not restricted to 'records related' to a correspondent account 'in the United States,' but rather appears to address any correspondent account, including accounts located abroad that have no relation to the United States." Bank Three's Opp'n at 33 (emphasis in original); see also Bank Three's Sur-Reply at 4. Bank Three has correspondent accounts in countries other than the United States, and the subpoena covers those accounts too. Bank Three's Sur-Reply at 4. Additionally, Bank Three continues, the subpoena, by encompassing signature cards, account ledgers cards, account statements, and due diligence records for the target account and transactions, is not limited to records related to Bank Three's correspondent account in the United States. Bank Three's Opp'n at 35; Bank Three's Sur-Reply at 4.[11]
Two flaws erode the strength of Bank Three's contention. First, the bank's insistence that every record encompassed by the subpoena must itself "relate to" a correspondent bank account in the United States entirely ignores the final clause of 31 U.S.C. § 5318(k)(3)(a)(i), which authorizes subpoenas for "records maintained outside the United States relating to the deposit of funds into the foreign bank." Bank Three cites that clause at the outset of its opposition, see Bank Three's Opp'n at 2, but otherwise ignores it. The bank's sur-reply is no better. See Bank Three's Sur-Reply at 3-6. Indeed, under the disregarded final clause, a subpoena for records revealing the source of funds that [REDACTED] deposited into Bank Three and then funneled through the United States correspondent account, which might include records without a direct tie to the United States account, are accessible. As the government argued at the hearing, the final clause appreciates that "bank records can't be looked at in a vacuum, that money doesn't just appear there.... [T]he flow of funds are related.... [S]o when there is a foreign currency transaction that occurs in China, and that's what infuses the money into the account that illegally sends money here, absolutely that's related." Mar. 5, 2019 Tr. at 92:14-24. Drilling down on the connection, cash deposits, for example, *61 which would be documented in bank statements, are one way [REDACTED] might have funded the accounts used to launder money through the United States. FBI Decl. ¶ 48; see also id. ¶¶ 36-47 (explaining how North Korean front companies smuggle cash to fund payments via correspondent accounts). Intrabank transfers and foreign currency deposits are two other ways. Id. ¶¶ 49-56. Records capturing those deposits are precisely the type that the statute permits the government to subpoena.
Second, Bank Three's argument that the subpoena overreaches because it seeks signature cards, account ledgers cards, account statements, and due diligence records, among other records, none which relate to a correspondent account, glosses over "a key feature of the investigation-[REDACTED] solely existed as a front company for [REDACTED]." Gov't's Reply at 29 (citing FBI Decl. ¶¶ 8-10); accord id. at 37. No part of [REDACTED] can be separated from the ploy to put money through the United States financial market. Some of the subpoenaed records-such as signature cards-facilitated that effort, other records-such as ledgers, account statements, and due diligence-evidence aspects of that effort.[12] All, however, relate to the correspondent account or to [REDACTED]'s deposit of funds into its Bank Three account.
Only one other court, the District of Oregon, has reviewed whether a subpoena issued under 31 U.S.C. § 5318(k)(3) exceeds the scope of that statute. See United States v. Sedaghaty , No. CR 05-60008-HO, 2010 WL 11643384, at *5-6 (D. Or. Feb. 26, 2010). In Sedaghaty , the government was investigating "allegations of a false tax return and the failure to report money leaving the country." Id. at *1. One defendant allegedly had withdrawn $ 130,000 in traveler's checks and a $ 21,000 cashier's check from a bank in Oregon. Id. That defendant, and one other, then flew to Saudi Arabia, without reporting the currency exiting the country, and cashed the checks in a Saudi bank that had United States correspondent accounts. Id. In the subsequent year's tax return, the withdrawn funds were reported as having been spent on a prayer house or returned to *62 their original source. Id. As part of the related investigation, a subpoena, under 31 U.S.C. § 5318(k)(3), was sent to the Saudi bank for records including, signature cards, customer applications, ledger cards, bank statements, deposits, withdrawals, and those reflecting the cashing of the checks. Id. at *5. The bank objected, contending the records related to the defendant's personal account. Id. at *6. The government, on the other hand, argued that the request related to the defendant's "negotiation of the financial instruments at the center of the investigation" and that those instruments "were issued in U.S. dollars by U.S. banks and that the negotiation of those instruments inevitably related to correspondent accounts in the United States." Id. The court granted the government's motion to compel as to records directly related to the cashing of the cashier's and traveler's checks that had been issued by the United States banks, as well as to bank statements, ledger cards, and information about deposits and withdrawals into the account, but only "to the extent any documents related to the cashier's check and traveler's checks or otherwise to correspondent accounts with United States banks." Id. The motion to compel was not granted as to signature cards and customer applications. Id.
While Bank Three prefers that this Court outright deny the motion to compel based on the subpoenas purported overbreadth, see Mar. 5, 2019 Tr. at 89:2-22, curtailing the subpoena, a la Sedaghaty , is the fall back suggestion, id. at 90:6-8. Why the District of Oregon narrowed the subpoena and denied access to signature cards and customer applications, is not explained in the opinion. Two differences between that case and this one, however, jump off the page. There, the bank argued that some of the account records were for the target's personal account, in which case not all records were necessarily related to the correspondent banking activity. To the extent that may have animated the Court's thinking, no similar risk applies here. Additionally, records "related to the deposit of funds into the foreign bank" were not at issue as the investigation involved tracing how already identified financial instruments had been cashed. For each reason, the limits imposed by the Sedaghaty Court should not be imposed here.
Accordingly, the subpoena issued to Bank Three is within the authority conferred under 31 U.S.C. § 5318(k)(3)(A)(i). That subpoena can be enforced.
C. Comity
Authority to enforce the subpoenas is just step one. Step two is whether the court should exercise that authority to enforce the subpoenas. When an enforcement order would create a "true conflict" between domestic and foreign law, the Court should consider, as a matter of international comity, whether to abstain from exercising its authority. See Hartford Fire Ins. Co. v. California , 509 U.S. 764, 798-99, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (ruling that without a "true conflict between domestic and foreign law," there was "no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on grounds of international comity"); Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa , 482 U.S. 522, 555, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (Blackmun, J., concurring in part and dissenting in part) ("[T]he threshold question in a comity analysis is whether there is in fact a true conflict between domestic and foreign law. When there is a conflict, a court should seek a reasonable accommodation that reconciles the central concerns of both sets of laws."). The party relying on foreign law to establish a conflict, "assumes the burden *63 of showing that such law prevents compliance with the court's order." In re Grand Jury Subpoena , 912 F.3d at 633.
Here, determining whether compelling the banks to comply with the subpoenas would create a "true conflict" is the easy part. The government concedes that complying with the respective subpoenas exposes each bank to legal penalties in China. Gov't's Reply at 14 (agreeing that, "at least to some degree," Chinese law prohibits the banks from complying with the subpoenas); id. at 20 (agreeing that "compliance with the extant subpoenas 'might violate certain Chinese regulations and lead to administrative sanctions' " (quoting Gov't's Expert Decl. ¶ 10a)). Resolving the comity concerns is a murkier matter, however. On that issue, the parties disagree as to whether circuit precedent dictates the outcome. Assuming the answer is no, the parties also disagree on the proper approach to, and resolution of, comity concerns in this case. These issues are addressed in turn.
1. Circuit precedent
The banks contend that In re Sealed Case ("Sealed Case I "), 825 F.2d 494 (D.C. Cir. 1987), is on all fours with this case, and thus the comity analysis should begin and end there. Bank One's Opp'n at 16-18; Bank Two's Opp'n at 22-26; Bank Three's Sur-Reply at 16-18. In Sealed Case I , the D.C. Circuit reviewed an order holding a bank owned by Country X in contempt for refusing to produce records in response to a grand jury subpoena. 825 F.2d at 495. The records, which were sought in connection with a "grand jury investigation into an alleged scheme by a number of American citizens and business entities to launder money" were held in the bank's Country Y branch and Country Y's bank secrecy laws made responding to the subpoena a criminal offense. Id. Out of concern for "basic principles of international comity," the Circuit reversed the contempt order. Id. at 499. Although the opinion did not set out a standard, a constellation of factors were decisive in the Court's reasoning: the "sanctions represent an attempt by an American court to compel a foreign person to violate the laws of a different foreign sovereign on that sovereign's own territory," id. at 498 ; the contemnor "is not itself the focus of the criminal investigation in this case but is a third party that has not been accused of any wrongdoing," id. ; "the bank is not merely a private foreign entity, but is an entity owned by the government of Country X," id. ; "the government concedes that it would be impossible for the bank to comply with the contempt order without violating the laws of Country Y on Country Y's soil," id. ; and "the grand jury is not left empty-handed by today's decision," a reference to the Court's ruling that the bank's manager could be compelled to testify, id. at 499. Yet, the Court also explained that "[i]f any of the facts we rest on here were different, our holding could well be different." Id.
Sealed Case I 's caveat comports with the Supreme Court's treatment of international comity as a principle that depends on "prior scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to [alternative] procedures will prove effective." Societe Nationale , 482 U.S. at 543-44, 107 S.Ct. 2542. The particular facts "relevant to any comity analysis" include: "(1) the importance to the ... litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance *64 with the request would undermine important interests of the state where the information is located." Id. at 544 n.28, 107 S.Ct. 2542 (citing factors from the RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(1)(c) ).
In this case, the government discredits Sealed Case I , which was decided two months after Societe Nationale , because the Circuit's opinion did not explicitly reference the factors that Societe Nationale deemed "relevant to any comity analysis." Gov't's Mot.-Bank One at 27; accord Gov't's Mot.-Bank Three at 28. That Sealed Case I did not explicitly cite those factors does not mean that the D.C. Circuit was unaware of, or neglected, that recent Supreme Court decision and Sealed Case I is still good law in this circuit. Still, Societe Nationale matters as to whether Sealed Case I dictates a result here: should any of the factors deemed relevant by the Supreme Court differ between Sealed Case I and this case, then the particular constellation of facts here must be freshly considered.
Indeed, two critical circumstances, drawn from Societe Nationale 's factors, distinguish this matter from Sealed Case I . First, the investigation in Sealed Case I pertained to "an alleged scheme by a number of American citizens and business entities to launder money." 825 F.2d at 495. The precise nature and purpose of the illegal scheme is unknown to the modern reader, but the degree to which non-compliance with a subpoena related to money laundering by American citizens-a domestic law enforcement matter-implicates national interests hardly compares to the national security interests and associated potential harm caused by non-compliance with a subpoena related to an investigation into funding a state-sponsor of terrorism's nuclear weapons program, which poses catastrophic risks. See FBI Decl. ¶¶ 6a-f, 8-10.
Second, in this investigation the government insists that without compelling compliance, the requested information is out of reach. Gov't's Mot.-Bank One at 26; accord Gov't's Mot.-Bank Three at 27. The banks vigorously dispute the accuracy of the government's assertion, with each bank highlighting the commitments from the MOJ that any MLAA request will be timely reviewed and handled. Bank One's Opp'n at 19; Bank One's Sur-Reply at 10-11; Bank Two's Opp'n at 25-26; Bank Two's Sur-Reply at 10; Bank Three's Sur-Reply at 17. While the banks have made commitments to turn over the requested records to the MOJ, and the MOJ has made commitments to timely review the records, whether those records ever arrive in the United States is less certain. Close scrutiny reveals that the MOJ's commitments in this case are not so firm.
The first MOJ letter about this case, sent to Bank Three in March 2018, committed to "review[ing] and handl[ing] [an MLAA] request timely in accordance with the [MLAA] and relevant PRC laws." Mar. 22, 2018 MOJ Ltr. The MOJ's next two letters, each sent in 2019 and addressed directly to this Court, proclaim that "[t]he MOJ would timely review and handle the requests for assistance sought by DOJ in accordance with the [MLAA] and applicable domestic laws. For the request in line with the [MLAA], China will provide assistance to the United States accordingly," Jan. 6, 2019 MOJ Ltr. at 4, and that if "DOJ makes a MLA[A] request in the present case, the MOJ will promptly review and process it. To be more specific, if such a US request complies with the applicable provisions of the [Law of PRC on International Legal Assistance in Criminal Matters] and the MLAA, the MOJ will promptly transfer the request to Competent *65 Authorities of China for further review and execution," Feb. 26, 2019 MOJ Ltr. at 3.
The caveats in the MOJ letters-that the requests must comply with the MLAA and Chinese law-do not refer to simple ministerial matters. By their own admission, Chinese officials have not always been satisfied with MLAA requests from the United States government. Id. at 6-7. Additionally, the United States government has been disappointed before in a case in which the MOJ "indicated that they would act on the MLAA request and cooperate in the investigation," only to leave the MLAA requests unanswered. DOJ Decl. ¶ 13c. Even Bank Two acknowledges that the MOJ's representations about compliance are no guarantee. Bank Two's Opp'n at 19 (suggesting that the government should have made an MLAA request so that, if nothing else, the Court "would know by now that such a request was futile"). As discussed at more depth in the comity analysis that follows, see Section III.C.2.d., infra , the MOJ's purported willingness to comply with an MLAA request in this case might be concrete enough to weigh against enforcing the subpoena, but the MOJ's caveats, as well as the United States' past MLAA experience, mean that unlike Sealed Case I, nothing guarantees that without compelling compliance the "grand jury is not left empty-handed." Sealed Case I , 825 F.2d at 499.[13]
For those two reasons, Sealed Case I alone does not direct the outcome here.[14]
2. Balancing the Comity Factors
Without precedent squarely on point, the Court's comity analysis must scrutinize "the particular facts, sovereign interests, and likelihood that resort to [alternative] procedures will prove effective." Societe Nationale , 482 U.S. at 544, 107 S.Ct. 2542. At a minimum, that analysis encompasses the five restatement factors that the Supreme Court has said "are relevant to any comity analysis." Id. at 544, n.28, 107 S.Ct. 2542. Again, those are: "the importance to the investigation or litigation of the documents or other information requested; the degree of specificity of the request; whether the information originated in the United States; the availability of alternative means of securing the information; and the *66 extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442(c)(1).[15] The government considers those five factors the entirety of the comity analysis. Gov't's Mot.-Bank One at 20; Gov't's Mot.-Bank Three at 20. The banks, drawing from Second Circuit case law, introduce two other relevant factors: "hardship of the party facing conflicting legal obligations and whether that party has demonstrated good faith in addressing its discovery obligations." Linde v. Arab Bank, PLC , 706 F.3d 92, 110 (2d Cir. 2013) ; see also Bank One's Opp'n at 21 (listing the seven Second Circuit factors as the relevant standard); Bank Two's Opp'n at 17 (same); Bank Three's Opp'n at 18-19 (same). The government tepidly resists inclusion of the latter two factors, reading Societe Nationale to have "deemed only Restatement § 442's five factors 'relevant' to the comity analysis," Gov't's Reply at 30 n.21 (emphasis in original). Societe Nationale 's list, however, was not exclusive. See Richmark Corp. v. Timber Falling Consultants , 959 F.2d 1468, 1476 (9th Cir. 1992) (noting that Societe Nationale 's "list of factors is not exhaustive"). Other factors might be relevant too.
Although never having articulated neatly the comity standard, the D.C. Circuit has endorsed the Second Circuit's two additional factors. Returning to Sealed Case I , the D.C. Circuit distinguished two cases in which the Eleventh Circuit affirmed enforcement of subpoenas against foreign entities for records held abroad as instances in which the contemnor had not acted in good faith. Sealed Case I , 825 F.2d at 498 (distinguishing In re Grand Jury Proceedings , 691 F.2d 1384 (11th Cir. 1982) and In re Grand Jury Proceedings Bank of Nova Scotia , 740 F.2d 817, 826 (11th Cir. 1984) ). The banks' good faith, then, is properly considered. So too is the hardship that compliance would impose. On that issue, the D.C. Circuit, again in Sealed Case I , wrote:
A decision whether to enter a contempt order in cases like this one raises grave difficulties for courts. We have little doubt, for example, that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders. The legal expression of this widespread sentiment is found in basic principles of international comity. But unless we are willing simply to enter contempt orders in all such cases, no matter how extreme, in utter disregard of comity principles, we are obliged to undertake the unseemly task of picking and choosing when to order parties to violate foreign laws. It is conceivable that we might even be forced to base our determination in part on a subjective evaluation of the content of those laws; an American court might well find it wholly inappropriate to defer to a foreign sovereign where the laws in question promote, for example, torture or slavery or terrorism.
825 F.2d at 498-99. Explicitly, the D.C. Circuit recognized that unless courts are to disregard comity entirely, courts must decide when to enforce an order that will conflict with foreign law. The hardship of the conflict is an essential part of that analysis.[16]
*67 Thus, whether, as a matter of comity, enforcing the subpoenas here would be unreasonable depends on application of the seven factors that the Second Circuit has clearly articulated and the D.C. Circuit has, at least implicitly, endorsed.[17] Those seven factors are considered seriatim.
a) Importance to the Investigation of the Requested Information
To begin, the government avows the "[t]he subpoenaed documents are the foundation of the United States' investigation" as without the records "the government lacks visibility as to the identities of the financial facilitators behind this scheme, the source of the illicit funds into these accounts, where remaining funds may have been transferred, and the banks' roles in facilitating such activities." Gov't's Mot.-Bank One at 21; accord Gov't's Mot.-Bank Three at 21-22. More specifically, the records are necessary, for example, because North Korea, using "third-country intermediaries," relies on "bulk cash smuggling and other illicit activity that supports, among other things, its proliferation of [weapons of mass destruction] technology and missile systems," FBI Decl. ¶¶ 40-41. Bank statements and cash deposits will allow investigators to trace these inflows and outflows of cash, information the government cannot otherwise access. Id. ¶¶ 36, 48. Additionally, records of intrabank transfers into or out of [REDACTED]'s account will disclose co-conspirators, which, again, is information the government cannot otherwise access. Id. ¶¶ 49-51. Bank statements and records are needed also "to determine if any U.S. Dollar [REDACTED] accounts were used to convert foreign currency to/from U.S. dollar," id. ¶ 53, and the extent to which Chinese bank officials knowingly facilitated payments for North Korea's benefit, id. ¶ 59.
The banks do not dispute that the requested records would contain the information that the government describes or that such information would further the investigation. See Bank One's Opp'n at 22 (admitting that Bank One "cannot speak directly to what documents the Government may think it does or does not need as part of its grand jury investigation"); Bank Two's Opp'n at 18 (assuming "that the documents sought by the U.S. are important to the grand jury"). The Court, thus, agrees that the records are essential to the investigation underway.
Nevertheless, "the Government waited nearly an entire year after the issuance of the Subpoena to file its Motion." Bank One's Opp'n at 22; accord Bank Two's Opp'n at 18. Moreover, the government "declined to pursue an MLAA request" as an alternative means of seeking the documents. Bank Two's Opp'n at 18. Although the delay and decision to forgo a possible means for obtaining the records suggest that the current investigation is not urgent, those facts are not as damning as appears at first blush. In between issuing the subpoenas and filing the motions to compel, the Department of Justice twice sent a delegation to China to discuss China's *68 responsiveness to MLAA requests. DOJ Decl. ¶ 17. Moreover, the Department of Justice was engaged in intra- and inter-agency deliberations during the interim about the most prudent way to secure the records. Id. ¶ 18; FBI Decl. ¶ 80. Treading lightly on a matter implicating delicate diplomatic considerations should not be held against the government.
On this record, the first factor favors the government. If the government's lack of alacrity might otherwise have tempered how heavily this factor tilts to the government, other considerations indicate that caution should not be so ruinous.
b) Specificity of the Request for Information
As to the second factor, the subpoenas are tailored to specific financial records, for a defined date range, at banks [REDACTED] is known to have used to launder funds. See Grand Jury Subpoena; Admin. Subpoena; see also FBI Decl. ¶ 9. Bank Two concedes that "[t]he request is reasonably specific." Bank Two's Opp'n at 18. Bank One agrees in part, appreciating that the subpoenas seek records "related only to one entity and one account for a specific time period," but argues that the subpoena is too broad because "it requests production of all records" related to [REDACTED], which sweeps in "documents unrelated to the alleged illicit U.S. dollar payments made by [REDACTED] for the benefit of the North Korean government." Bank One's Opp'n at 22-23.[18]
As the government points out, "[REDACTED] solely existed as a front company for [REDACTED]." Gov't's Reply at 29 (citing FBI Decl. ¶¶ 8-10). Thus, contrary to Bank One's position, all [REDACTED] records relate to the conduct under investigation. Given the nature of that investigation, the subpoenas hardly could be narrower. Other courts have found subpoenas that seek information limited to accounts known to be connected to the matter under investigation satisfactorily specific. See Gucci Am., Inc. v. Weixing Li ("Gucci I "), No. 10 CIV 4974 RJS, 2011 WL 6156936, at *6 (S.D.N.Y. Aug. 23, 2011), vacated, 768 F.3d 122 (2d Cir. 2014) ;[19] see also Nike, Inc. v. Wu ("Nike II "), 349 F.Supp.3d 346, 365 (S.D.N.Y. 2018) (finding subpoena sufficiently specific because "the plaintiffs had connected the counterfeiting activities with certain accounts located at the subpoenaed banks").
This factor supports enforcement of the subpoenas.
c) Origin of the Information
The documents at issue here originated in China. The government concedes that this factor counsels for respecting principles of international comity. Gov't's Mot.-Bank One at 21; Gov't's Mot.-Bank Three at 22. No further discussion is needed.
d) Alternative Means of Obtaining the Information
As to the fourth factor, the parties' disagreement is quite pronounced.
*69 The MLAA between the United States and China commits the countries to providing assistance "in proceedings related to criminal matters," including "providing originals, certified copies or photocopies of documents, records or articles of evidence." MLAA Arts. 1, 2. While acknowledging that the MLAA "remains an effective law-enforcement tool in some investigations," the government adds that "China has not provided-via the MLAA channel-records similar to those subpoenaed by the grand jury in this investigation in at least 10 years." Gov't's Mot.-Bank One at 21-22; accord Gov't's Mot.-Bank Three at 22. Conversely, the banks say that China's responsiveness to MLAA requests has not been so poor and, in any event, both the banks and the MOJ have committed to responding to an MLAA request in this case. Bank One's Opp'n at 23-26; Bank One's Sur-Reply at 19-20; Bank Two's Opp'n at 15-16, 19; Bank Two's Sur-Reply at 5-8; Bank Three's Opp'n at 29-33; Bank Three's Sur-Reply at 15-16.
As a threshold matter, enforcing the subpoenas does not require that the government resort first to the MLAA's evidence sharing mechanisms. Societe Nationale , 482 U.S. at 542-43, 107 S.Ct. 2542 ; Sealed Case II , 832 F.2d at 1283. Indeed, the Supreme Court has not imposed a rule of first resort because "[i]n many situations" procedures like those of the MLAA will be "unduly time consuming and expensive, as well as less certain to produce needed evidence." Societe Nationale , 482 U.S. at 542, 107 S.Ct. 2542. Nevertheless, enforcing a subpoena that compels conduct in violation of foreign law may be ill-advised if investigators have alternative means to obtain the same information. Sealed Case I , 825 F.2d at 499 ; see also Richmark , 959 F.2d at 1475 ("If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law.").
Historical precedent offers good reason for the United States to suspect that the MLAA, for records like those sought in this case, is not a real alternative. The Associate Director for the Department of Justice's Office of International Affairs of the Criminal division, which is the United States office responsible for making and receiving MLAA requests, explained that the MLAA "has been helpful in some limited circumstances," but not when it comes to bank records. DOJ Decl. ¶¶ 1, 6, 8. Over the last decade, the United States has made approximately 50 MLAA requests to China for bank records, only 15 of which have produced any response. Id. ¶ 9. Of those 15, most have been incomplete, untimely, or failed to include certification needed for the records' admissibility in a United States court. Id. At times, China's response was only a summary of the requested records. Id. ¶ 11. Currently, the United States has 40 MLAA requests pending, including the United States' ten most recent MLAA requests, 22 of which are for bank records. Id. ¶¶ 10, 13, 13a.
The MOJ has only a slightly different take on the history. By that agency's telling, China, between 2015 and 2017, sent the United States evidence about financial accounts on eight occasions. Jan. 6, 2018 MOJ Ltr. at 3-4. In response to the DOJ declaration, the MOJ identifies one occasion in which China responded to a 2017 MLAA request and notes that in another case, when China took several years to respond to an MLAA request, the two countries had been communicating about the request in the interim. Feb. 26, 2019 MOJ Ltr. at 6-7.[20] At bottom, the historical *70 precedent described in the DOJ declaration, to which the MOJ offers only a meager response, inspires little confidence that the MOJ would respond to an MLAA request, let alone on a timely and complete basis. See Nike II , 349 F. Supp. 3d at 366 (recognizing the MOJ's "historical precedent" of failing to answer Hague Convention requests); Wultz v. Bank of China Ltd. ("Wultz II "), 910 F.Supp.2d 548, 557-58 (S.D.N.Y. 2012) (finding the MOJ's past practices validate concerns that Hague Convention requests are not viable alternative to subpoena).
Still, the banks insist that this case is different because the banks and the MOJ have committed to respond to an MLAA request. Indeed, Bank Two "has given its assurances that it will produce the requested documents within days of a request through the MLAA," Bank Two's Opp'n at 16; accord Bank Two's Sur-Reply at 3, and Bank Three "took steps to collect and preserve documents" days after receiving the subpoena, Bank Three GM Decl. ¶ 14. Bank One's commitments are less concrete, but that bank represents that it offered in Spring 2018 to cooperate with an MLAA request, Bank One's Opp'n at 10, 22, 25, and could have the records ready in 30 days, Mar. 5, 2019 Tr. at 47:3-7.
Since receiving the subpoenas, the banks have acted in good faith and the sincerity of their willingness to comply is not questioned. The banks' compliance, however, gets the government only part way to the records sought. The MOJ's compliance, as well as that of other Chinese authorities, also is necessary, and that cooperation is doubtful. Through three letters, the MOJ has expressed how it will handle an MLAA request in this case. The first, the MOJ's March 2018 letter to Bank Three, explained that the MOJ would "review and handle [an MLAA request] timely in accordance with the [MLAA] and relevant PRC laws." Mar. 22, 2018 MOJ Ltr. The second, a January 2019 letter addressed to the Court, said that the MOJ "would timely review and handle the requests for assistance sought by the DOJ in accordance with the [MLAA] and applicable domestic laws. For the request in line with the [MLAA], China will provide the assistance to the United States accordingly." Jan. 6, 2019 MOJ Ltr. at 4. The third, a follow up letter to the Court, explained that "if the DOJ makes a MLA[A] request in the present case, the MOJ will promptly review and process it. To be more specific, if such a US request complies with the applicable provisions of the [Law of the PRC on International Legal Assistance in Criminal Matters] and the MLAA, the MOJ will promptly transfer the request to Competent Authorities of China for further review and execution." Feb. 26, 2019 MOJ Ltr. at 3. The MOJ provided assurances about its own promptness but not about other Chinese government components' review process. Nor did the MOJ promise that the response would be usable to the United States government but preemptively invited the United States to "make a supplement[al] request or clearly express the requirements, and we will timely process and respond to that request." Id.
These MOJ letters harm the banks' case more than help. First, the MOJ's third letter clarifies that the MOJ is not the last level of Chinese review. So even if the banks' and the MOJ's commitments are sound, other Chinese agencies will be involved. Those authorities have made zero commitments in this case. Second, the MOJ assures that even if initial production does not generate records usable in an American court, the MOJ will consider *71 supplementary requests. That back and forth, which might never culminate in the release of usable records, could take years. See DOJ Decl. ¶¶ 9, 13a; Feb. 26, 2019 MOJ Ltr. at 7. Third, the MOJ's final letter introduces a separate Chinese law-the International Legal Assistance in Criminal Matters-that any MLAA request must satisfy. That law puts both the MOJ and "the National Supervisory Committee, the Supreme People's Court, the Supreme People's Procuratorate, the Ministry of Public Security, the Ministry of State Security and other departments ... in charge of international criminal judicial assistance," and makes those government agencies "responsible for examining and handling ... criminal judicial assistance requests made by foreign countries." Bank Two's Opp'n, Decl. of Professor of Law and Vice Dean at Peaking University Law School ("Bank Two Expert Decl."), Ex. B-18, International Criminal Judicial Assistance Law at Art. 6, ECF No. 3-21 (No. 18-176). That law also imposes independent requirements upon any country making a request of China for criminal legal assistance related to the collection of evidence. Id. at Art. 28-Art. 30. Whether China might use this law to stall any response to an MLAA request is, at best, unknown.
Moreover, the government has been down this road before. In August 2016, the Department of Justice prepared and sent an MLAA request for bank records related to Dandong Hongxiang Industrial Development Co., Ltd., another agent of North Korea. FBI Decl. ¶¶ 14-16, 71. During an August 12, 2016 meeting, "Chinese authorities nominally agreed to work jointly with the U.S. authorities and requested a working group meeting to further discuss cooperation with DOJ officials familiar with the [Dandong] investigation." Id. ¶ 72. Despite that assurance, Chinese officials did an about-face two weeks later, and advised that China would not cooperate. Id. ¶ 73; see also DOJ Decl. ¶ 13c. A new MLAA request was sent in April 2017, and the Department of Justice still has not received a response. FBI Decl. ¶ 74; DOJ Decl. ¶ 13c. The Department of Justice no longer needs to take overtures of China's willingness to assist the United States' with investigations into North Korea seriously.
Why not, Bank Two, asks, make the government try at least one last time to explore the MLAA route given that, "the MOJ's credibility with this Court and every other federal court would be at issue if it did not fulfill its commitment." Bank Two's Sur-Reply at 7. Despite the facial reasonableness of this suggestion, forcing such a request would be ill-conceived. The United States and China have different interests as to North Korea. FBI Decl. ¶¶ 80-81. Allowing China to gum up United States' investigations by dictating how the United States can pursue evidence, especially when the two countries' interests are not aligned, is antithetical to sound law enforcement. Id. ¶ 83. Furthermore, in some instances the United States needs access to records without Chinese authorities taking a first pass. Id. ¶ 84. Finally, banks with knowledge that their records might be subject to a federal subpoena, without the shield of the MLAA slow-down process, would have a greater incentive to take care that their customers were not violating United States criminal laws. Id. ¶ 85. These policy rationales instruct against forcing the government to pursue an MLAA.
For the foregoing reasons, the government does not have a viable alternative and China should not be allowed to hold United States' law enforcement priorities hostage under the pretense of anticipated MLAA compliance. This factor favors the *72 government and enforcement of the subpoenas.
e) Interests of Sovereigns in Conflict
Marching on to the fifth factor, the United States' interest in this case pertains to national security: "how North Korea, a nuclear armed state that is a state sponsor of terrorism, financed its weapons of mass destruction program in spite of extant sanctions." Gov't's Mot.-Bank One at 24; accord Gov't's Mot.-Bank Three at 25. Consequently, non-enforcement would undermine a critical national interest.
The banks have different responses. Bank Three "does not dispute that the United States has a strong interest in combating money laundering and enforcing international sanctions," Bank Three's Opp'n at 23, but argues that compelling production may frustrate those interests by having a "chilling effect on future communications by Chinese bank," id. at 24 (quoting Wultz v. Bank of China Ltd. , 942 F.Supp.2d 452, 467 (S.D.N.Y. 2013) ). Conversely, Bank One and Bank Two each suggest that no interest of the United States is undermined if the motions to compel are denied because the United States has an alternative means of accessing the same records. Bank One's Opp'n at 26; Bank Two's Opp'n at 20.
Non-enforcement of the subpoenas would undermine the United States' interests a great deal. First, the argument that no interest of the United States would be undermined because the United States has an alternative means of obtaining the same records is misdirected. Beside being factually incorrect, that argument bleeds together the fourth and fifth factors. Whether the government has alternative ways of getting the documents is a stand-alone consideration and not a reason to discount whether non-enforcement would undermine the United States' interests. Indeed, if the availability of an alternative were given the dispositive significance that Bank One and Bank Two suggest, none of the remaining factors would have to be considered. The consequence would be a de facto rule of first resort to any international treaty despite the Supreme Court having rejected such a rule, at least when, as here, the relevant treaty does not contain exclusivity language. Societe Nationale , 482 U.S. at 544, 107 S.Ct. 2542 ("We therefore decline to hold as a blanket matter that comity requires resort to Hague Evidence Convention procedures...."); see also DOJ Decl. ¶ 7 ("The MLAA contains no provision stating that it shall be the exclusive mechanism for the parties to obtain evidence from one another."). As for Bank Three's argument that compelling disclosure would actually harm the United States' national security interest, this is a point to which the Executive Branch is owed some deference. United States v. Davis , 767 F.2d 1025, 1035 (2d Cir. 1985) ("We must therefore accord some deference to the determination by the Executive Branch-the arm of the government charged with primary responsibility for formulating and effectuating foreign policy-that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure."). Thus, for this factor, non-enforcement is properly considered an impediment to the United States' national security interests.
On the other side of the balance, the government characterizes China's national interest as "protecting the [purported] right to privacy incorporated into its bank secrecy laws." Gov't's Mot.-Bank One at 24-25 (quoting In re Grand Jury Proceedings , 691 F.2d at 1391 ); accord Gov't's Mot.-Bank Three at 25-26. That characterization of the Chinese interest implicated here, the banks say, is too dismissive. Rather, China's interest is "upholding its *73 bank secrecy laws, which are designed to protect customer privacy, maintain customer confidence in commercial banks, and ensure the stability of the country's financial system." Bank Two's Opp'n at 19 (citing Bank Two Expert Decl. ¶ 13, ECF No. 3-3 (No. 18-176)). Bank Three paints with a similar brush, describing China's interest as "promoting confidence in a developing banking system." Bank Three's Opp'n at 23. Finally, Bank One cites a number of laws that an order compelling compliance would violate-including "banking laws and regulation, cybersecurity laws, administrative regulations, criminal and judicial assistance laws"-and adds that "[s]uch an outcome would undoubtedly undermine the legitimate interest of a foreign sovereign." Bank One's Opp'n at 26-27.
China's interest in the development of a sound banking system is legitimate, contrary to the government's assertions otherwise, Gov't's Reply at 18, and bank secrecy laws protect that interest. Nevertheless, China's interest would not be undermined by enforcement of the subpoenas. Under Chinese law, Chinese banks may disclose bank records to a "competent organ" if that organ has presented to the bank a notice required by Chinese regulation. Bank Two Expert Decl. ¶ 19. Competent organs include "judicial organs, administrative organs, military organs and public institutions exercising administrative functions." Id. ¶ 20. While allowing for limited disclosure to Chinese authorities does not mean that similar disclosure to United States authorities would be legal under Chinese law, these exceptions reflect that even Chinese authorities recognize that bank secrecy can co-exist with limited disclosure to government agencies. Therefore, insofar as the laws at issue here further China's interest in a stable banking system, disclosure to the United States in response to an investigatory subpoena is not a detriment to that interest. Other courts have drawn a similar inference from Chinese laws permitting disclosure of bank records to the Chinese government. See In re Grand Jury Proceedings , 532 F.2d at 408 ("Field seeks to prohibit a United States grand jury from obtaining information that would have been obtainable by officials there for their own investigations. Since the general rule appears to be that for domestic investigations such information would be obtainable, we find it difficult to understand how the bank's customers' rights of privacy would be significantly infringed simply because the investigating body is a foreign tribunal."); Tiffany (NJ) LLC v. Forbse , No. 11 CIV 4976 NRB, 2012 WL 1918866, at *8 (S.D.N.Y. May 23, 2012) ("The fact that numerous Chinese government organs are vested with the power to override the confidentiality provisions only underscores the notion that the secrecy laws were not designed to protect Chinese citizens who engage in unlawful behavior.").
In sum, the non-enforcement of the subpoenas would undermine the United States national security interests and not undermine any articulated Chinese interest. This factor heavily favors enforcement of the subpoenas. See Wultz II , 910 F.Supp.2d at 559 ("The interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty."); id. ("[T]he Chinese interest in building confidence in its banking industry does not encompass an interest in protecting the confidentiality of those who participate in the funding of international terrorism.").
f) Hardship on the Party Facing Conflicting Obligations
For the sixth factor, the parties' disagreement on the facts relevant to *74 hardship is narrower than the parties might concede. Administrative fines, by the government's account, are possible if the banks comply with the subpoenas. See Gov't's Expert Decl. ¶¶ 25, 29, 30. Civil liability, however, according to the government, is off the table because the banking customer-[REDACTED]-is defunct. Id. ¶¶ 10b, 13, 20. None of the three banks contest how [REDACTED]'s status changes the risk of civil liability. See Bank One's Sur-Reply at 7-8; Bank Two's Sur-Reply at 3-5; Bank Three's Sur-Reply at 11-15; see also Bank One's Sur-Reply, Ex. 1, Suppl. Decl. of Bank' One's Expert ("Suppl. Bank One Expert Decl.") ¶ 49, ECF No. 18-2 (No. 18-175) ("The defunct status of the account holder does not provide immunity for such banks from administrative penalties by administrative authorities or criminal charges."); see generally Bank Two's Sur-Reply, Decl. of Partner at [REDACTED] ("Suppl. Bank Two Expert Decl."), ECF No. 12-3 (No. 18-176) (submitting declaration about Bank Three's possible exposure without discussing civil liability); Bank Three's Sur-Reply, Suppl. Decl. of Bank Three's U.S. Counsel, Ex. 1, Feb. 25, 2019 Bank Three's Chinese Counsel's Ltr. ("Feb. 25, 2019 Bank Three Ltr."), ECF No. 12-1 (No. 18-177) (same). That leaves disputed two issues germane to hardship: (1) how likely are the three banks, given the Chinese government's ownership stake in each, to face severe administrative penalties, and (2) for the same reason, how likely are the banks, or their employees, to face criminal penalties.
According to the banks, responding to the subpoenas requires that the banks disregard a litany of Chinese laws which impose fines up to "RMB 500,000 Yuan"-which converts roughly to $ 74,000-for unauthorized inquiries into bank accounts and for the unlawful dissemination of banking information. See Bank One's Opp'n, Decl. of Attorney at [REDACTED] ("Bank One Expert Decl.") ¶¶ 50, 52, 75, ECF No. 6-2 (No 18-175); Bank Two Expert Decl. ¶¶ 17b, 24-25, 27; Bank Three U.S. Counsel Decl., Ex. 1, Jan. 7, 2019 Bank Three's Chinese Counsel's Ltr. ("Jan. 7, 2019 Bank Three Ltr.") at 6, 8-10, ECF No. 4-1 (No. 18-177).[21] Moreover, unlawful disclosure of client information might lead to suspension or revocation of banking licenses. Bank One Expert Decl. ¶¶ 51, 57; Bank Two Expert Decl. ¶ 25. The MOJ also declares that the if the banks comply they "will be subject to administrative penalties such as fines, suspension of banking operation and revocation of license and so on...." Jan. 6, 2019 MOJ Ltr. at 2-3. The banks' state ownership will not insulate them from punishment, the banks insist, as state-owned banks have been sanctioned before. See Jan. 7, 2019 Bank Three Ltr. at 10; Feb. 25, 2019 Bank Three Ltr. at 4; Suppl. Bank One Expert Decl. ¶ 13.
Although the banks cite multiple laws which would support the imposition of administrative penalties, actual examples, or the lack thereof, of penalties having been imposed against a bank in comparable cases has swung other Courts' analysis of whether the imposition of penalties is likely. Compare Nike I , 349 F.Supp.3d at 340 ("[T]he cases cited by [the bank's expert], 'are plainly inapposite to the facts of the case at bar[,] ... [as] the Bank[s] ha[ve] cited no specific instance in which a Chinese *75 financial institution was punished for complying with a foreign court order directing the production of documents." (quoting Gucci I , 2011 WL 6156936 )) with Tiffany (NJ) LLC v. Qi Andrew , 276 F.R.D. 143, 158 (S.D.N.Y. 2011) ("Unlike Milliken, the Banks here have cited Chinese cases in which a commercial bank was held liable to its customer after turning over the individual's funds or information to a third party."). Here, while the banks list laws authorizing severe administrative penalties and insist their ties to the government are not immunizing, none points to any example in which a state-owned Chinese enterprise has faced severe repercussions for responding to the order of a foreign court. Of the banks' examples of fines imposed against government-affiliated Chinese banks, only one is for a case in which a bank disclosed customer information-although not in compliance with a foreign court order-and, in any event, of the examples, only one fine exceeded 400,000 Renminbi. Bank One Expert Decl. ¶¶ 54-56; Bank Two Expert Decl. ¶ 31; Jan. 7, 2019 Bank Three Ltr. at 10, 15. Further underscoring the dearth of any comparable past practices, letters from Bank Three's Chinese counsel cite as evidence that the Chinese government will not hesitate to impose meaningful punishment, instances in which an insolvent bank was shuttered, banks were fined for violating anti-pollution laws, a bank was fined, and its chairman prosecuted, for violating anti-competition laws, and banks were fined for unlawful billing practices. Jan. 7, 2019 Bank Three Ltr. at 19; Feb. 25, 2019 Bank Three Ltr. at 21-22. The absence of any relevant past practice corroborates that each bank's connection to the Chinese government is strong reason to doubt that any is "a credible object of severe government sanctions." Gov't's Expert Decl. ¶ 105 (emphasis added). One district court has adopted that perfectly plausible supposition. See Nike, Inc. v. Wu ("Nike I "), 349 F.Supp.3d 310, 340 (S.D.N.Y. 2018) ("The Banks 'are closely tied to the Chinese state and are in many respects quasi-governmental entities,' and [the government's expert] states that, in his expert opinion, it is unlikely that the Banks or their employees would face serious repercussions if ordered to comply with the Subpoenas.").
By the same token, the government can point to relevant precedent, which differentiates this case from ones in which the party seeking enforcement has been unable to present "any instances in which Chinese banks complied with a United States court order compelling production of documents without negative consequence." Qi Andrew , 276 F.R.D. at 159. Indeed, the trio of Gucci cases from the Southern District of New York began with the district court ordering the Bank of China to comply with a Rule 45 subpoena, despite protestations from the bank that such an order would subject the bank to "heavy fines" and could subject employees to "several years in jail." Gucci I , 2011 WL 6156936, at * 11. For reasons unrelated to the district court's order that the bank comply with the subpoena, the Second Circuit remanded the case and instructed the district court to "consider the question of comity again in light of the newly available December 4, 2013 Judgment of the Second Intermediate People's Court of Beijing Municipality, and any subsequent judgments it finds relevant." Gucci II , 768 F.3d at 142. That judgment, which was subsequently affirmed by China's Higher People's Court, was issued in a civil suit brought by Bank of China customers whose accounts had been frozen pursuant to a separate order issued by the Southern District of New York; the Chinese judgment required only that Bank of China pay 140 Renminbi in court fees-which converts roughly to $ 21.
*76 Gucci III , 135 F.Supp.3d at 101-102. The miniscule fine, the district court concluded, as well as the absence of any sanction for the bank's compliance with the order to disclosure records, substantiated that the bank's claim that enforcing a subpoena for records would lead to heavy fines and criminal punishment was overblown. Id. at 104. Thus, even if Chinese law authorizes administrative penalties, the imposition of significant punishment against banks, owned in large part by the Chinese government, for producing records in response to a foreign court's order lacks historical precedent.
As with severe administrative penalties, the lack of historical precedent reduces the banks' concerns about criminal punishment to pure speculation. Bank Three has four examples of criminal cases being brought against bank employees, but in each case the bank employee stole and sold client information for profit. Jan. 7, 2019 Bank Three Ltr. at 8. Bank Two's examples have the same dissimilarity. Suppl. Bank Two Expert Decl. ¶¶ 16-19. Here too the Gucci trio of cases, which did not result in any criminal prosecution, is most probative.
Finally, the banks highlight the MOJ's letters as confirmation that penalties will follow from an order enforcing compliance with the subpoenas. See Bank One's Opp'n at 15; Bank Two's Opp'n at 15; Bank Three's Opp'n at 19-20. Of course, "[i]n the spirit of 'international comity,' a federal court should carefully consider a foreign state's views about the meaning of its own laws." Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co. , --- U.S. ----, 138 S.Ct. 1865, 1873, 201 L.Ed.2d 225 (2018). How much weight to afford the foreign government's position, however, is context dependent and "[r]elevant considerations include the statement's clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." Id. at 1873-74.
Here, the MOJ's letters have some indicia of credibility. The MOJ's counsel was sought prior to the government having initiated proceedings to compel compliance with the subpoenas and the Chinese government has consistently resisted the United States' attempts to enforce subpoena compliance as contrary to Chinese law. See Gucci II , 768 F.3d at 128 (describing letter from the Commission and the People's Bank as proclaiming that "China's laws prohibit commercial banks from ... turning over account records pursuant to foreign court orders"). Nevertheless, as previously noted the, the MOJ letters contribute little to the banks' case. If anything, the MOJ is circumspect about what penalties will result if the banks comply. The MOJ's first letter advises Bank Three that "the banking regulatory authorities will impose administrative penalties and fines on you, and you may bear civil or criminal liabilities depending on your situation." Mar. 22, 2018 MOJ Ltr. From the beginning, the MOJ is non-committal about civil and criminal penalties. In addition, the allusion to civil liability gives the impression that the MOJ is not enmeshed in the details of the case. While the letter promises administrative sanctions, only fines are referenced and nothing about the severity of such fines is mentioned. The second letter gives somewhat more detail, explaining that, under China's Commercial Banking Law, if the banks comply with the subpoenas they "will be subject to administrative penalties such as fines, suspension of banking operation and revocation of license and so on, civil suits from the account holders whose accounts have been *77 illegally interfered with, and even criminal liabilities according to different circumstances." Jan. 6, 2019 MOJ Ltr. at 3. Yet, like the first letter, this letter gives no concrete indication criminal penalties are likely and fails to reference how [REDACTED]'s dissolution affects any civil liability. Additionally, although the second letter says sanctions "will" be imposed, that letter's reference to administrative penalties lists only possible sanctions rather than what penalties the banks will face. Moreover, the introduction of suspending the bank's operating licenses is a departure from the first letter. Finally, nothing about the second letter, or the first for that matter, suggests the administrative penalties will amount to more than nominal fines. The MOJ's letters, then, provide only thin support to the banks' case that court-ordered compliance with the subpoenas will trigger substantial punishment from Chinese authorities.
In sum, the banks have established a basis in Chinese law for the imposition of punishment should any of the banks be compelled to comply with the subpoenas. Yet, such penalties, severe or otherwise, would be unprecedented. While the MOJ has said that the three banks, if they comply, will face administrative penalties, the MOJ's letters do not suggest that the Chinese government is inclined to take the counter-intuitive step of imposing heavy penalties against banks in which the Chinese government has a substantial ownership interest. At most, this factor tips ever so slightly toward the banks.
g) Good faith
Finally, the government agrees that none of the banks has acted in bad faith. Gov't's Reply at 31. Thus, the final factor favors the banks.
* * * * *
That leaves only how to balance the factors. To recap, the records' Chinese origins, the slim chance of the banks suffering some hardship if forced to comply, and the banks' good faith through this process all militate against enforcement of the subpoenas. Conversely, the importance of the subpoenaed records, the specificity of the subpoenas, the lack of alternative channels for obtaining the records, and the risk of undermining a United States national security interest at the pinnacle of importance, all favor enforcement.
Per the government, "[t]he balance of national interests is arguably the most important comity factor." Gov't's Mot.-Bank One at 23 (citing Richmark Corp. , 959 F.2d at 1476 ); see also Gov't's Reply at 17 (calling the respective interests of the sovereigns the " 'first and most important factor' of the Restatement test" (quoting In re Grand Jury Proceedings , 532 F.2d 404, 407 (5th Cir. 1976) )). Bank Three, for its part, agrees that the countries' competing interests carry primary importance, but cites precedent that puts the hardship of compliance on equal footing. Bank Three's Opp'n at 19 (citing Minpeco, S.A. v. Conticommodity Servs., Inc. , 116 F.R.D. 517, 522 (S.D.N.Y. 1987) ).
On balance, international comity is not a reason to refrain from compelling compliance with the subpoenas. The most important factor, the interests of the relevant countries, could not fall more firmly in favor of enforcement. National security is at stake on one side; on the other, no national interest is compromised. Additionally, the United States government has subpoenaed only records relevant to its national security investigation and has done so because no effective alternative method of accessing those critical records exists. The banks' potential hardship is speculative, and, in any event, any penalty is unlikely to be consequential. While the *78 records originated in China, and the banks, commendably, have acted in good faith, the importance of those factors pale in comparison to the remainder of the calculus.
Application of the factors redound strongly in favor of compelling compliance.
IV. CONCLUSION
For the foregoing reasons, each of the government's three motions-to compel compliance with the grand jury subpoenas issued to Bank One and Bank Two and the administrative subpoena issued to Bank Three-is granted.
Bank One and Bank Two are ordered, pursuant to the grand jury subpoenas served by the government, to appear before the grand jury to provide testimony at the earliest date available to the grand jury, or, in the alternative, Bank One and Bank Two shall, if the parties agree, promptly complete production of the subpoenaed records, in lieu of appearing before the grand jury.
Bank Three is ordered to complete production of the subpoenaed records by March 28, 2019.
Additionally, the parties are ordered to submit, by April 17, 2019, a joint report advising the Court whether any portions of this Memorandum Opinion may be unsealed.
An appropriate Order accompanies this Memorandum Opinion.

Bank One is [REDACTED]; Bank Two is [REDACTED]; and Bank Three is [REDACTED].

The same reply is docketed at ECF No. 7 in Case No. 18-176 and ECF No. 10 in Case No. 18-177.

The government's motion to compel production from Bank One and the motion to compel production from Bank Two are identical. For ease, only one of those motions is cited in this Memorandum Opinion.

A correspondent account is "an account established to receive deposits from, make payments on behalf of a foreign financial institution or handle other financial transactions related to such institution." 31 U.S.C. § 5318A(e)(1)(B).

[REDACTED] also have been designated. See Notice of OFAC Sanctions Actions, [REDACTED] (designating [REDACTED] ); Notice of OFAC Sanctions Actions, [REDACTED] (designating [REDACTED] ); Notice of OFAC Sanctions, [REDACTED] (designating [REDACTED] ).

This provision was enacted through the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, Pub. L. 107-56, § 319, 115 Stat. 272, 312-14 (2001).

The only difference between the relevant language in the two consents is that Bank One's consent refers to the "Board," while Bank Two's refers to the "Board of the Governors of the Federal Reserve System."

These consents were discovered at the Court's prodding. See Min. Order (Mar. 4, 2019). Although the government did not learn of the consents in time to discuss them in the motions to compel, the government has not waived the argument that the banks' consents apply here since the government had no reason to know of the banks' consents, which were in the custody of the banks themselves and the Federal Reserve.

Bank One also argues that the consents violate the "unconstitutional conditions doctrine," Bank One's Suppl. at 3-4, which prevents "the government from coercing people into giving [enumerated rights] up," or from "burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them," Koontz v. St. Johns River Water Management Dist , 570 U.S. 595, 604, 606, 133 S.Ct. 2586, 186 L.Ed.2d 697 (2013) ; see also Autor v. Pritzker , 740 F.3d 176, 181 (D.C. Cir. 2014) ("Even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, ... [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests."). So, for example, the government cannot condition a benefit, such as a land use permit, on the relinquishment of a right that is less valuable than the benefit; the unconstitutional conditions doctrine would prohibit such "[e]xtortionate demands." Koontz , 570 U.S. at 604-05, 133 S.Ct. 2586. Bank One makes no effort to illuminate why a narrow consent to jurisdiction in exchange for the right to access the United States financial market is coercive.

In an egregious mischaracterization, Bank One's sur-reply suggests that its opposition to the government's argument that the United States is the appropriate forum was "implicit." Bank One's Sur-Reply at 3 n.1.

Bank Three also asserts that "the subpoena is overly broad because the documents it requests are not tailored to any reasonable timeframe." Bank Three's Opp'n at 36. Yet, the subpoena goes back only to 2012. [REDACTED]'s correspondent banking activity stretches back until at least October 2012, and [REDACTED] was designated in [REDACTED]. As the government explains, "[l]aw enforcement needs to review records prior to the initial and final months of known U.S.-dollar transfers to learn where and how [REDACTED] initially drew in and then ultimately sent out illicit proceeds from its [Bank Three] account." Gov't's Reply at 39 (citing FBI Decl. ¶¶ 76-77). This explanation for why the government is seeking records from 2012 "is not 'obviously wrong' " and thus "must be accepted." FTC v. Invention Submission Corp. , 965 F.2d 1086, 1089 (D.C. Cir. 1992) (quoting FTC v. Carter , 636 F.2d 781, 787-88 (D.C. Cir. 1980) ).

That the USA Patriot Act authorizes access to a large array of records is unsurprising. Even before the terrorist attacks of September 11, 2001, problems related to correspondent banking were on Congress's radar. A Senate report from February 2001 identified foreign jurisdictions that combined weak banking practices with access to the United States financial market through correspondent accounts as "attractive venues for money launderers seeking banks to launder illicit proceeds and move funds into bank accounts in other countries." Minority Staff of S. Subcomm. on Investigations , 107th Cong. , Rep. on Correspondent Banking: A Gateway for Money Laundering * 31 (2001). Sure enough, the Congressional findings for Title III of the USA Patriot Act, which enacted provisions such as the authority for the administrative subpoena in this case, included that "correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions," and that "United States anti-money laundering efforts are impeded by outmoded and inadequate statutory provisions that make investigations, prosecutions, and forfeitures more difficult, particularly in cases in which money laundering involves foreign persons, foreign banks, or foreign countries." See USA Patriot Act § 302(a)(6), (8), 115 Stat. at 296-97. Correspondingly, an announced purpose of Title III was "to provide a clear national mandate for subjecting to special scrutiny those foreign jurisdictions, financial institutions operating outside of the United States, and classes of international transactions or types of accounts that pose particular, identifiable opportunities for criminal abuse." USA Patriot Act § 302(b)(4), 115 Stat. at 297.

The government emphasizes a third basis to distinguish Sealed Case I : the subpoena recipient there would have been compelled to violate the laws of a third country. See Gov't's Reply at 32-33. That distinction, however, supplies a reason both for and against compelling compliance. On the one hand, unlike the banks here, which are based in, and partially owned by, China, the Country X bank could not be sure that Country Y would show restraint when considering whether to punish the bank. Mar. 5, 2019 Tr. at 33:21-34:2. In this light, the case for enforcement is stronger here than in Sealed Case I . On the other hand, as Bank Three argues, compelling a bank to violate its "own nation's law is more prejudicial to international comity." Bank Three Sur-Reply at 18. A Country X bank can shutter the Country Y portion of its business; a Chinese bank cannot leave China. Mar. 5, 2019 Tr. at 79:5-22. In this light, the case for enforcement was stronger in Sealed Case I than here.

Contrary to the government's position, nor does Sealed Case II , alone, dictate the outcome here. See Gov't's Reply at 32-34 ("Sealed Case II controls this case, not Sealed Case I ."). In Sealed Case II , the D.C. Circuit rebuffed a grand jury witness's argument that, as a matter of comity, the witness should not be held in contempt for failing to comply with a subpoena. 832 F.2d at 1283. In reaching this conclusion, the D.C. Circuit noted that it was "not clear from the Witness' brief that Swiss law forbids the companies or their custodians from complying with the subpoena even in regard to documents located in Switzerland." Id. Moreover, to the extent the witness, an American citizen, faced prosecution in Switzerland, that prosecution depended on the witness' voluntary return to Switzerland. Id. at 1273, 1283. Thus, the Court had no reason to abdicate its "power to order any party within its jurisdiction to testify or produce documents." Id. at 1283-84.

Since Societe Nationale , the Restatement of Foreign Relations Law has been updated, but the relevant factors have not changed. See Restatement (Fourth) of Foreign Relations Law § 426 cmt. a.

Bank One cites pieces of this passage for the conclusion that the D.C. Circuit has instructed against evaluating when a foreign law is worthy of respect. Bank One's Sur-Reply at 8. Reading the full text demonstrates that Bank One's conclusion is backward. The D.C. Circuit, although appreciating the unseemliness of the task, understood that evaluating foreign laws is integral to any comity analysis.

Bank One argues that Restatement (Third) of Foreign Relations § 442(2) instructs that sanctions should not ordinarily be imposed against a witness who fails to produce records that are located in a country that prohibits disclosure of the records. Whether or not this is a case for application of the ordinary rule, the Court is not reviewing a motion to hold the banks in contempt. Contempt proceedings may follow but have not yet arrived.

Bank Three, for its part, does not argue as part of the comity analysis that the records request is too broad. The bank did advance that argument in relation to whether the subpoena exceeded the government's authority under 31 U.S.C. § 5318(k)(3)(A)(i). Insofar as those arguments also could be considered in the comity context, they are unavailing for the same reasons already discussed.

While the Second Circuit vacated this opinion for the district court to reconsider personal jurisdiction over the Bank of China in light of intervening Supreme Court precedent, the circuit "discern[ed] no abuse of discretion" in the district court's "comity analysis pursuant to § 442 of the Restatement (Third) for Foreign Relations Law." Gucci II , 768 F.3d at 141.

The MOJ letter also flags the United States' less-than-remarkable history of responding to MLAA requests, Feb. 26, 2019 MOJ Ltr. at 7, a fact merely showing that neither country is satisfied with the other's performance under the MLAA.

The relevant laws include Article 73 of China's Commercial Banking Law, Article 40 of the Regulation on Credit Investigation, Article 28 of the Corporate Deposit Regulations, Article 32 of the Anti-Money Laundering Law, and Article 64 and 66 of China's Cybersecurity Law. Bank One Expert Decl. ¶¶ 50, 52, 57; Bank Two Expert Decl. ¶ 17b, 24-25, 27; Jan. 7, 2019 Bank Three Ltr. at 6, 8-10.